# Wheeling.

## WILLIAM T. MANN *vs.* ANDREW LEWIS *et al.*

### January Term, 1869.

1. In the year 1864, in the county of Greenbrier, whose citizens had been declared to be in insurrection and rebellion by the proclamation of the President of the United States, and where the authority, both civil and military, of the so-called Confederate States Government was in domination, payment of a bond in the treasury notes of the so-called Confederate Government, where the creditor was urged by the debtor (who had not demanded the debt and who was a loyal man) to take said treasury notes but who refused to do so, and was then told that he was "obliged to take them under the laws of the Confederate Government," was a payment made and received under duress *per minas*, and therefore void.

2. M. brought a bill to enforce a vendor's lien alleged to be due to himself. On the hearing of the cause the court decided that he had no lien or right in the premises and decreed costs against him ; and being of opinion that it was a proper case for a decree between co-defendants, for settling rights and equities, decreed a deed from one defendant to another. HELD :

> That the decree for the deed between the defendants was not matter of which M. could complain.

William T. Mann filed a bill in the circuit court of Greenbrier county, in March, 1867, against Andrew Lewis and John Argabright. It was alleged in the bill that in October, 1856, one John Butler sold to Lewis a tract of land, and bound himself in a title bond to make a deed by the 25th day of December, 1856. No purchase money was paid at the time of the sale. Butler died in 1859, and Argabrite was his executor. The bill further alleged that Lewis applied to complainant to become his surety for the unpaid purchase money to the executor, which he consented to do upon condition that Lewis gave him the title bond to indemnify him for any payment he might have to make by reason of his suretyship. The bonds thus given amounted to 247 dollars and 35 cents on the 18th of October, 1859.

That on the 1st day of February, 1864, the balance due was 301 dollars and 59 cents, which was paid by the complainant to the executor and that he took up the bonds. He charged a lien on the land in his behalf. and asked a sale of the land to refund the money and interest thus paid.

The answer of Argabrite stated that about the 1st of February, 1864, Mann came to his house and offered to pay the bonds in so-called Confederate money, and that he refused to take the same, because he had no confidence in it and did not wish to have any connection with the Confederate government even by taking its currency; and for the further reason that the heirs and legatees of his testator were loyal citizens of a loyal State to whom the said notes could be of no value; that the complainant importuned him to take it, and that he refused to do so until the complainant told him that the so-called Confederate notes were a legal tender and he was required by law to take them, and that it would not be safe for him to refuse to receive them. That upon these false representations, menaces and fraud he was induced and coerced to take the notes and deliver up the bonds signed by Lewis and the complainant. · He denied any lien or right in the complainant.

Lewis answered, stating that the complainant came to him a short time before the bonds were given and falsely stated that Argabrite required additional security, and proposed to become his surety; but denied that it was then proposed that respondent should transfer the title bond to the complainant. That afterwards, in 1866, the complainant came to his house and stated to him that it was time the deed was made, and requested respondent to give him the title bond; that he would take it to Argabrite and have the deed executed to respondent, whereupon he gave him the bond believing that he would act in good faith; that afterwards, when asked if the deed had been executed, he replied that he intended to hold on to the title bond until he received the money he had paid. That in 1867, Argabrite notified him that he had received nothing that he regarded of any value from the complainant, but had only received

worthless Confederate treasury notes under menace and threats, and that if he would pay the balance still due upon the land he would make him a good deed, and save him harmless; and that he did shortly thereafter pay the amount due to Argabrite, and that no deed had yet been made and he was entitled to one.

There was a deposition in the cause which went to show that the complainant had said that Argabrite did not want to take the money, but he told him that he was obliged to take it under the laws of the Confederate government; another deposition stated that the complainant had told Argabrite at the time of payment that Lewis had gone off. There were other proofs in the cause but they were not pertinent to the question decided by the court.

The court below decreed that Argabrite, having been paid off by Lewis, should convey the land to him, and decreed costs to the defendants against the complainant, stating that the circumstances under which he paid Argabrite the Confederate money amounted to fraud, if not to duress.

Mann appealed to this court.

*C. S. Sperry* for the appellant.

The court is referred to the petition for an appeal for the general features of the case and for the points of error relied on. There can be no doubt about the fact that such bonds as are filed with the bill were executed by Andrew Lewis as principal and the appellant William T. Mann as security; nor that those bonds were given for the purchase money of land for which there existed the vendor's lien. They were given to Argabrite, executor of Butler; who, in his lifetime, had sold the land to Lewis, and these bonds were a renewal of the old bonds with Mann as security, Butler's executor still holding the legal title until the whole of the purchase money should be paid.

Did Mann pay these bonds so as to substitute himself to the rights of Argabrite, the executor? He affirms in his

bill that he did pay them, and produces them in court with his bill with a receipt endorsed on them in these words: "Received three hundred and one dollars and fifty-nine [cents] from William T. Mann, the security of these two notes, which amount is principal and interest up to this, the 1st day of February, 1864. John Argabrite, executor of John Butler, deceased." Thus the possession of these bonds, with the receipt endorsed thereon, would at least afford *prima facie* evidence that Mr. Mann had paid them.

Has Col. Argabrite overcome the *prima facie* evidence? We think not.

In his answer Col. Argabrite says, after saying that he did not want to receive Confederate notes in payment, that "complainant importuned respondent to receive the said notes, and respondent still refused to do so, until complainant falsely stated to him that such notes were a legal tender and that he was required by law to receive them in discharge of said bonds, and that it would not be safe for respondent longer to refuse to receive said notes. Upon these representations made by complainant, respondent received said notes of said Confederate government (so-called) and delivered to complainant the said two bonds." These are the words of the answer. Then follow certain conclusions from the premises which may or may not be legitimate. We are now dealing with the facts. Is this statement proved? There is not a word of proof upon the subject in the record except what is furnished by the deposition of Robert McVey. He says that Mann came to his house and said he "had been to Col. Argabrite's and paid him 200 dollars in Confederate money." Let us pause here a moment and see if Mr. McVey's memory can be relied on. He says that Mann said he had paid Argabrite 200 dollars, the receipt on the bonds says 301 dollars and 59 cents. Is it probable that Mann said 200 dollars when the sum exceeded 300? This discrepancy shows the necessity of receiving this testimony with caution. Human memory is very frail at best, as we all know, but its errors can not always be detected, here, however, it is detected, and must

necessarily dilute the moral force of the other testimony which the witness gives.

The witness proceeds, "that Mr. Argabrite did not want to take it, but he (Mann) told him that he was obliged to take it under the laws of the Confederate government." This is every word of proof upon the subject. Does it sustain the answer? Does it say that it would not be safe for him longer to refuse to receive the money? Is there menace of any kind in this declaration. It was an opinion expressed upon the law of the case, and nothing more. Col. Argabrite had as much right, and as full an opportunity, to know what the laws of the Confederacy were, as a private man like Mr. Mann.

A mistaken affirmation of what the law is, is not fraud. *Russell* vs. *Brunham*, 8 Blackf., 277; Chitty on Cont., side pages 591–2; Story on Cont., sec. 507. The misrepresentation must be of an important *fact*. There was no fraud practiced and no fraud proved.

The answer says what the witness does not say, "that it would not be safe for respondent longer to refuse to receive said notes." The witness says no such thing. We think we may therefore conclude that Mr. Mann's *prima facie* evidence of payment and ownership of the bonds has not been overcome by the answers and proof, and we may further affirm that the bonds were certainly paid by Mann, if payment could be made and received in Confederate money. The transaction between them was final and complete.

We are not aware of any decision of any court, high or low, in which payment made and received in such money accompanied with a surrender of the bond to the debtor was not held to be a good payment—a closing of the transaction. In *Brown* vs. *Wiley*, 2 W. Va., Rep., the court held the payment good. Osborn & Tomlinson had purchased of Brown and paid him in Confederate notes, thus completing the contract, and the court in almost unnecessarily strong terms held the contract binding; and the case of *Brown* vs. *Wiley*, may be regarded as an ultra case.

It may be insisted that the decision of the immediate case

between *Brown* vs. *Wiley* is against us in this.     But we respectfully say no.   In that case the purchase of the land was for Confederate money.     The whole contract was tainted, as the court thought, by the agreement *to pay* and *to receive* payment in Confederate money.     A part of the purchase money remained unpaid and the suit was brought to enforce that payment.   Not so here.   The contract between Lewis and Butler was for good money, and so with the bonds in suit.   They were given before there was any Confederacy in existence, and were for good money?   Lewis did not defend the suit upon the ground that the bonds were founded upon an illegal consideration, but Argabrite upon the ground that the bonds had not been paid and were still his, and that was really the sole material question in the case. Then whose bonds are these ?   If payment was made they were Mann's bonds; if they were not paid they were still Argabrite's bonds.

Judge Chase, holding a circuit court in Richmond, in November, 1868, did not think that Confederate notes were as contaminating to a contract as some other judges had held.   In the case of *Kcpple* vs. *the Petersburg Railroad Company*, he said that "this currency," speaking of Confederate notes, "may fairly be said to have been imposed on the country by irresistible force.   There was no other in which the current transactions of business could be carried on, and there could be no other while the rebel government kept control of the rebel States.   The necessity for using this currency was almost the same as the necessity to live * * * At the same time this currency, though it depreciated rapidly, had a sort of value."   *   *   *   He decreed the payment of dividends in lawful money, the amount to correspond with the *value* of the Confederate money at the time. He rendered a similar decision in the case of *Bott, Byrne & Co.* vs. *Crenshaw*, instructing the jury that if they found Crenshaw liable as counsel for money received, and that the money received was Confederate money, they should ascertain the gold value of the Confederate money at the time it was received, and make that the measure of damages.

Judge Harrison, in the Greenbrier circuit, decided, in the case of *Kent, Paine & Co.* vs. *David Surber's administrator et al.*, that the administrator was entitled to the full amount of the bonds of the estate which he had paid off with his own Confederate money.

If this honorable court should, however, think that a court of chancery should not regard the payment of the bonds complete, it should still reverse the decree and dismiss the bill without prejudice to any suit at law which the appellant might see proper to bring upon the bonds in Argabrite's name.

Taking this whole case together we cannot help thinking that the court rendered a most wonderful decree. Without a particle of proof of fraud the court affirmed that there was "*frand* at least, if not duress," (what sort of duress the court alluded to bothers us amazingly), "and the court was further of opinion that whether voluntarily or involuntarily the payment was accepted by John Argabrite, such payment is null and void, because illegal and because the contract upon which it was paid is still unexecuted." How was the payment illegal if voluntarily accepted by Argabrite, and made without fraud or duress? And was not the contract between Argabrite and Mann executed? What was necessary to be done to execute it but to pay the money and surrender the bonds.

Then the court proceeds to decree the land to Lewis and that the defendants recover the costs. The bill of the plaintiff is not dismissed; he, however, is required to pay the costs and unasked relief is extended to the defendant Lewis. This was certainly extra-superserviceable. Certainly Mr. Mann is entitled to have the value of his money refunded to him, and this in any view of the case.

*N. Richardson* for the appellees.

BROWN, President. In 1856, John Butler sold to Andrew Lewis a tract of land in Fayette county. Lewis executed

222        COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,            Mann vs. Lewis et al.            1869.

his bonds to Butler for the purchase money and Butler executed his title bond to Lewis for the land.

In 1859, Butler died, leaving a will with John Argabrite as his executor, who thereafter took new bonds from Lewis, with William T. Mann as his surety therein, in lieu of the old ones. In 1864, Mann paid off the balance of these bonds, amounting to 301 dollars and 59 cents, with Confederate treasury notes (so-called), and obtained from Lewis a title bond upon a promise to take it to Argabrite and get Lewis the deed, representing that Argabrite was getting old and might drop off at any time. Argabrite refused to make the deed, alleging the said treasury notes to be worthless. Lewis then demanded the title bond of Mann, which he refused to give up, saying he intended to keep it until he got his money. Lewis, by his agent, repaid to Argabrite the 301 dollars and 59 cents, which Mann had paid in Confederate paper, as above stated, with the understanding that Argabrite should make the deed, which he is willing to do. The bill made Argabrite as executor and Lewis defendants, and prays that the land be sold to repay to complainant the money paid by him with interest and for general relief.

The answer of Argabrite alleges that the complainant by false representations, menaces and fraud induced and coerced this respondent to receive the said worthless and illegal notes and to deliver to him the said bonds.

Lewis also answered the bill controverting the claims of the complainant.

The charge of fraud and duress having been distinctly made in the answer and proofs taken to sustain the charge, it becomes necessary to consider and determine that question. Does the evidence sustain the charge? The appellant insists that it does not. And if the occurrence had happened as described in the ordinary times of peace and security, where every man could expect and have the protection of the government and law, it might be very questionable whether the charge of fraud and duress could be sustained in this case. But this case, like every other, must be viewed in the light of the time, place and circum-

stances of its occurrence, and of the state of things then existing, and the condition of the country, of which the court must take judicial notice so far as the same have relation and bearing upon the case.

The time then of the occurrence was in 1864, in the midst of a fierce civil war. The place was in the county of Greenbrier, which was one of the many counties of Virginia whose citizens were declared by the President of the United States, in his proclamation of July 1st, 1862, to be in a state of insurrection against the government and Union.

That the said county at the time was under the domination of the rebel authorities, civil and military, is a matter of public history, and that a citizen who was loyal to the Constitution and Union and to the State of West Virginia was not secure in standing upon the rights to which he was entitled under the government and laws by which his case is now tried. The evidence shows he was a Union man and loyal to the Union; that he did not wish to deal in the so-called Confederate treasury notes, and refused to receive them. That he did not seek the appellant, but on the contrary the appellant sought him and urged him to take the paper, which Argabrite regarded as worthless, and which could be of no value whatever to those for whose benefit he was acting, viz: the legatees of his testator, but appellant "told him he was *obliged* to take it, under the laws of the Confederate government." To discredit the contraband currency of the Confederacy by refusing to receive it, under such circumstances, might have been hazardous to one not suspected nor chargeable with loyalty to the Union, but to one of known loyal sympathies it was doubtless a cause of serious apprehension when he might consider the historical fact that Libby Prison and Castle Thunder were full of his loyal fellow-citizens, whose only crime was their loyalty to the Constitution and the Union. Pressed by a man who was taking advantage of his position to pay a debt in depreciated and illegal paper, for which he was only security, (and payment of which was not demanded), threatened with the compulsion of a pretended law of the so-called Con-

federacy, under such circumstances and such surroundings and with such hazards before him and with such cause of reasonable apprehensions of danger, it was not unnatural that he yielded to importunities and threats of the appellant. He cannot be said to have acted freely or to have consented of his own accord in the eye of the law to receive the contraband and worthless article in discharge of a valid and well secured debt. It was a case of duress *per minas.* Lord Coke says, the fear of imprisonment is enough. 2 Inst., 483; Co. Litt., 253b.

In the case of *Foskay* vs. *Ferguson*, 5 Hill, 154, it is said "if a deed might be avoided nearly three centuries ago on the ground that it was procured by threats and the fear of illegal imprisonment, there can be no room for doubt upon the question at the present day. As civilization has advanced the law has tended much more strongly than it formerly did to overthrow everything which is built upon violence and fraud." And again it is said by Judge Bronson in the same case, "but I entertain no doubt that a contract procured by threats and the fear of battery or the destruction of property may be avoided on the ground of duress. There is nothing but the form of a contract in such case, without the substance. *It wants the voluntary assent of the party* to be bound by it. And why should the wrong doer derive an advantage from his tortious act? No good reason can be assigned for upholding such a transaction."

The court decreed a conveyance from Argabrite to Lewis and gave costs against the complainant.

It is claimed for the complainant that as he was the security of Lewis he had a right to pay off the bonds, which being dated before the war were good, and was thereby entitled to be substituted to the shoes of Argabrite, the creditor, and thus enforce the vendor's lien on the land, and that as between him and Lewis it was not material how he paid the debt to Argabrite. He also claims this to be an executed contract. But Argabrite rightly insists that cannot be so, since he, the vendor, has not made the deed in pursuance of the contract, and refuses to do so until he shall be paid

in good money.  And a court of equity will not compel him
to do so for a party whose claim is based upon an illegal con-
sideration and transaction as this is.  *Brown* vs. *Wylie*, 2
W. Va., 502, and *Calfee* vs. *Burgess*, *infra.*

There was no error, therefore, in refusing the relief which
the complainant sought at the hands of the court of equity.
Nor was it a matter of which complainant might complain
to require the defendant Argabrite to convey to the co-de-
fendant Lewis, at the expense of the latter, the land which
Lewis had paid him for in good money, and thus avoid an-
other suit.

I think, therefore, that the decree of the court below
should be affirmed, with costs and damages to the appellees.

The other judges concurred.

DECREE AFFIRMED.