# Wheeling.

## WILLIAM T. MANN vs. ROBERT McVEY.

### January Term, 1869.

1. If the representation of a party was true, that the Confederate treasury notes were a legal tender, and the creditor was, under circumstances which influenced his action and coerced his consent, thereby induced to receive them in payment of a debt, it was a fraud; if such representation was not true and was used under like circumstances to coerce the unwilling and reluctant assent of the creditor to surrender his rights against his recognized interests, it was duress *per minas.*

2. The party acting as agent for another in the payment of Confederate treasury notes, under circumstances which amount to duress *per minas,* is responsible for the consequences of his own unlawful acts.

3. No allowance can be made for the market value of Confederate money which it was not lawful to pass as currency, but if a party who has been coerced into receiving it dispose of it for value, his claim to recover the amount of a debt paid under such circumstances should be abated to the amount of such value received. In the absence of proof as to that value no presumption can arise that it was of any value.

4. A case similar to *Mann* vs. *Lewis et al., infra,* in regard to what constitutes duress *per minas,* in Greenbrier county, in 1863, by reason of the rebellion.

Robert McVey filed a bill in the circuit court of Greenbrier county, in January, 1867, against William T. Mann, alleging that one Lewis Burdett, with Moses Hedrick as his surety, executed two bonds to the complainant in March, 1859, for 460 dollars each. That both of the obligors died, and on the 25th day of August, 1862, one James Mann, the son of the defendant William T. Mann, took out letters of administration from the county court of Greenbrier county, which court was acting under the authority of the so-called Confederate government at Richmond, upon the estate of Hedrick; that the administrator afterwards offered to pay the amount of the bonds to the complainant in Confederate treasury notes, who regarded them as worthless and refused

to receive them for such payment; that in the latter part of
the year 1863, the defendant came to the house of the com-
plainant as the agent of his son, the administrator, and ten-
dered the amount of the bonds in Confederate treasury notes,
when the complainant, still regarding them as worthless,
again refused to take them in payment; that the defendant
fraudulently and falsely represented to the complainant that
the notes had been made a legal tender and that he was
obliged to receive them; that the estate of Burdett was in-
solvent and that the estate of Hedrick was compelled to pay
the complainant's bonds, and that he then and there ten-
dered the amount thereof in Confederate notes which if he
did not take he would never get anything. The bill fur-
ther charged that Burdett's estate was not insolvent, but
that relying upon the fraudulent representations of the de-
fendant, as the professed agent of his son, the administrator,
and believing that the so-called Confederate States had en-
deavored to bolster up their failing cause by making their
treasury notes a legal tender, the complainant received the
notes and delivered up the bonds to the defendant. That
these bonds against the complainant were settled in the ad-
ministration account of James Mann for their full value.
The complainant prayed that the defendant be required to
pay him the amount of the bonds that he fraudulently ob-
tained from him with interest and for general relief. The
defendant answered, denying substantially all the allega-
tions of the bill, and stated that the complainant had ap-
plied to him to know what to do with the bonds on the es-
tates of Burdett and Hedrick, and said that he did not want
to take Confederate money if he could help it, but he be-
lieved if the administrator of Hedrick would send him the
money he would take it, and that subsequently James Mann,
the administrator, gave him the money and he took it to
the complainant who received it and gave him up the bonds.
Defendant alleged that this was all the connection he had
with the matter, and denied all fraud.

Some depositions were taken in the cause to prove that
the complainant was a loyal man during the rebellion, and

to prove a conversation between him and the defendant in which the latter told the former if he did not take Confederate money he would get nothing; that it was a legal tender and that Burdett's estate was insolvent and he would have to sue the estate of Hedrick and by that time the property of the latter would be squandered.

The court rendered a decree for the sum of 960 dollars with interest, subject to sundry credits paid before the war, and costs. The defendant appealed to this court, alleging for error that no fraud was established, that a court of equity had no jurisdiction to afford relief, that there was no proof to show what was the amount of the debt paid off by Confederate notes, and that the bill should have been dismissed with costs, because if a court of equity could give relief it was against the administrators of Burdett and Hedrick and their heirs.

*C. S. Sperry* for the appellant.

Whatever was done by the appellant in this case was done for James Mann, the administrator of Moses Hedrick, deceased. He had himself no interest in the transaction. The money to pay the bond to McVey was of the estate of Moses Hedrick, and furnished by the administrator. He was merely the medium through which the transaction was effected. He neither made nor lost a dollar by it. Let the whole transaction be set aside, and Mann would be neither gainer nor loser by it. He did not owe the debt to McVey, and if it was not paid, in the eye of equity, it remained a debt due from the estate of Burdett and Hedrick, not from him. A court of equity will sometimes set aside a transaction for fraud in its procurement, and restore the parties to their original position. "But a court of equity will not rescind a contract upon the ground of fraud without the clearest proof of such fraud." Chitty on Contracts, side page, 590. This is the utmost that the court will do. In no instance has it been known to punish the party with damages, This is the business of a court of law. Where a fraud has been committed by even a stranger to the trans-

action, a court of law, where the case is properly made out, will afford relief in damages to be assessed by a jury. This is the utmost that has been or can be done. No reported case has gone farther than this. Certainly, the authorities referred to by the judge who decided the case, when properly understood, do not go farther than this.

The case referred to in 2 Rob. Prac., (new), 621, was a case at law and verifies the doctrine here enunciated.

If the representatives of Burdett and Hedrick had been before the court, as they ought to have been, as the counsel for McVey at one time thought, and as we think, what would have been the measure of relief, assuming the fraud? Would it have been that Mann should pay damage commensurate with the amount of the debt? We apprehend not. The debt would have been regarded as unpaid, and decreed accordingly. If in consequence of the fraud the debt, or any part of it, was *lost*, then Mann, to that extent, in a *suit at law*, might have been liable. This would have been the utmost extent of his liability. Damages for his fraud were all, in any view of the case, that could be recovered of him. It is impossible for any court, law or equity to saddle him with the debt of another, unless it was lost by his fraud. See the authorities referred to in the petition. *Robertson* vs. *Hogshead*, 3 Leigh, 667, and *Sims* vs. *Lewis*, 5 Munf., 29.

Is it proved that Mann committed any fraud? We deny that it is.

In the first place it would have been a most remarkable act of fraud. He had no interest in the debt, and his son had no interest in it. The money paid belonged to the estate of Hedrick. So if a fraud was committed it was for the benefit of a stranger. In the next place the answer denies the fraud. To overcome the answer two witnessess are necessary, or one with concurring circumstances equal to another witness. This proof has not been furnished. Mrs. Hawver and John Hedrick are the only witnesses who speak upon the subject. He says that he overtook Mann in the road and asked him "if James Mann had been to see

Robert McVey about the bond." He said James had not, but he had been to see him himself. He said he had lifted the bond with Confederate money; that Robert did not want to take it, but under an act passed by the Confederacy he would have to take it or get nothing; that he could not make it off of Burdett's heirs under present circumstances." Then follow some leading questions which are not admissible. The "present circumstances," referred to, no doubt related to the want of a court to grant relief. No such court existed in Greenbrier county at the time. Mrs. Hawver, who heard the conversation, says that Mr. Mann *talked like it* would be better to take Confederate money than nothing. This is a noticeable discrepancy between what Mrs. Hawver says passed between the parties and what is reported as hear say by the witness.

Here, however, is no proof of fraud. Mr. Mann may have been right or wrong as to the law. A knowledge of the law was as open to the one party as the other. "The misrepresentation must be of a material fact and must be something in regard to which the one party places a known confidence in the other." 1 Story's Equity, sec. 197; 2 Kent's Com., 484–5; *Mason* vs. *Chopple*, 15 Grat., 572.

Mrs. Hawver's deposition was twice taken. The first one for some cause or other was suppressed. We do not know what was in it, but as it was never permitted to see the light of day we must presume that it did not suit; but to make the next one suit she was induced to write it out at home by herself, that she might not be embarrassed when she was giving it in before the commissioner, and the old deposition was privately read over to her that the weak points might be made strong. We might, therefore, expect conformity between the oral and written statement; but they do not exactly accord. She says she heard the conversation between the parties at McVey's house. "Mr. McVey objected to taking Confederate money, as it was worth so little at that time. Mr. Mann told Mr. McVey that he had better take Confederate money than nothing. Mr. McVey said he would sue Burdett's heirs and make the

money. Mr. Mann told him that it would be an endless suit; that he would have to wait until Burdett's heirs became of age, and if he could not make the money off of Burdett he would have to sue the Hedrick heirs, and by that time Hedrick's property would be squandered."

In her written statement she said Mr. Mann *talked like it would be better* to take Confederate money than nothing, not that "if he did not take the money he would get nothing;" not a word here about the notes being a legal tender, as charged in the bill; not a word about the insolvency of Burdett's estate and the knowledge of Mr. Mann to the contrary, as charged in the bill. Nothing to alarm Mc-Vey except the duration of a chancery suit, and this some people have really imagined is almost endless. He may not have been a perfectly good lawyer as to details, but not a very bad one as to results.

This is the proof of a gratuitous fraud practiced by Mann for the benefit of Hedrick and Burdett's estates, and this is the testimony upon which, in disregard of the defendant's answer, the court rendered a decree for what it said was the amount of the bond. Of the proof of the amount of the bonds there is none.

*Snyder* for the appellee.

BROWN, President. In this case a creditor received from the agent of a party acting as an administrator *de son tort*, of a deceased debtor, (the said party having qualified under the rebel authority), the amount of his debt in the so-called Confederate paper and surrendered up the bonds, during the war. After the war, he, the creditor, instituted suit in chancery against the said agent for his part in the transaction.

The prayer of the bill is that the defendant be decreed to pay to the complainant the amount of the bonds claimed to have been fraudulently obtained and for general relief. The charge of fraud in the bill is denied in the answer. And the first question is whether the charge of fraud and

duress is sustained by the evidence.    It was alike unlawful
for the plaintiff to receive illegal or contraband currency as
for the defendant to pay it if both acted alike freely, know-
ingly and willingly.    On this point the facts and circum-
stances of this case are almost identical with the facts and
circumstances on the same point in the case of the same
plaintiff, *Mann* vs. *Lewis* and *Argabrite, infra.*    And the
views there expressed are alike applicable here and conclu-
sive of this point.    Whether the representation of the de-
fendant Mann, as the agent of his son, was true or false, as
respects the alleged legal tender act of the so-called Con-
federate Congress, does not appear.    If false, the false repre-
sentation of so material a fact, under the circumstances of
the case, influencing the action and coercing the consent of
the creditor to receive a worthless and illegal currency in
discharge of a good debt, was a fraud.

But if, on the other hand, the statement were true, it was
duress *per minas* to make use of it to coerce, in like manner,
the unwilling and reluctant assent of the creditor to surren-
der his rights against his recognized interests.    1 Story's
Eq., 222; Adam's Eq., 182, 177; 2 Rob. Prac. (new), 621.

It has been urged that in thus trading in an article of
illegal currency the parties were *in pari delicto*, and that this
was a finished transaction in which a court of equity would
not interfere to rip open that which had been put to rest,
nor aid either of the guilty parties against the other.    But
the parties are not *in pari delicto.*    The creditor who is in-
duced against his will by fraud or coerced by duress *per
minas*, to receive that which he knows to be worthless or
nearly so, and likewise illegal, in the payment of a good
debt, is not equally guilty with him who by such means
fraudulently induced or coerced him to do it.    It is no ex-
cuse that the defendant acted in the matter in the interest of
his son, who was the administrator of the deceased debtor.
He is responsible for the consequence of his own unlawful
acts to the party injured by them.

There might be an inquiry whether the defendant should
have had deducted from the amount of the debt decreed

against, him the market value of the so-called Confederate treasury notes, or at least the amount which the plaintiff in fact realized out of it.

No allowance could be made for the market value of an article which he might not lawfully pass as currency; but if he had in fact passed or disposed of it for value, to that extent, and that only, the plaintiff's claim should have been dismissed; otherwise he too would be allowed to profit by his own wrong while invoking the aid of the court to prevent another from doing likewise. But there is nothing in the pleadings or evidence showing, or even tending to show, that the complainant ever passed or disposed of the said Confederate paper or any part of it. And since to have done so would have been unlawful and tending to continuance and give currency to an important instrumentality of the rebellion to which the evidence shows he was as a man loyal opposed, no legal presumption against him can arise in that behalf.

There is no ground, therefore, appearing to justify or call for an inquiry by reference to a commissioner on that point, nor to warrant this court in reversing the decree and remanding the cause to institute such inquiry.

I think, therefore, that there was no error in the decree of the court below, and that the same must be affirmed, with costs and damages to the appellee.

The remaining judges concurred.

DECREE AFFIRMED.