# CHARLESTOWN.

## SIMMONS v. TRUMBO.

### September 9, 1876.

1876
August Term.

1. The appearance of the defendants, and the putting in pleas in bar to the declaration, is a waiver of any irregularity at rule.

2. A general demurrer will lie to a count in a declaration, in an action of debt which fails to aver non-payment of the debt, but if there are other good counts in the declaration, a demurrer to the entire declaration should be overruled.

3. A general demurrer will not lie to a count in a declaration in debt, because the bond sued on is stated to be dated, "on the —— day of ——, 1860."

4. In an action of debt the entry on the record is, "the defendant for plea says, that he has well and truly paid the debt in declaration mentioned, and the statute of limitations; and of this he puts himself upon the country, and the plaintiff likewise, and issue is joined." This is a misjoinder of issue, cured by the statute of Jeofails after verdict.

5. Competent evidence, which has been permitted to go to the jury without objection, cannot be objected to in this Court.

6. No account of payments need be filed to admit proof of general payments.

7. Courts should take judicial notice of such facts as are matters of general history, affecting the whole people, such as the pendency, at a particular time, of the late war; that Confederate notes were issued early in the war by the Confederate Government, and these notes in a short time became almost the exclusive currency of the Confederate States; that during the first year of the war these notes were but slightly depreciated, and were then received throughout the Confederate States in the payments of debts, and

all the channels of trade, without doubt or question; that these notes were never made a legal tender in the payment of debts, by any act of the Confederate Congress; that a particular county, at a particular time, was *de facto* within, or without our jurisdiction.

8. But the courts should not take judicial notice of such facts as are not matters of general history, such as that a person entertaining certain political views was not safe "in his person or property, in some particular county at a particular time."

9. A party in the latter part of 1861, or early in 1862, residing in Pendleton county, accepts payment of a bond in Confederate notes, and surrenders the bond, the obligor having first said to him, that "he dare not refuse payment in Confederate notes; that if he did he would be considered disloyal, and would be liable to be put in prison and kept there during the war." Such surrender of the bond cannot be regarded as procured by fraud or duress, in the absence of all other evidence.

10. The testimony of such person that he surrendered the bond under such circumstances, through fear of imprisonment, would not make it duress, as the real inquiry is whether there was that degree of danger threatened and impending as would be sufficient to overcome the mind and will of a person of ordinary firmness; and not whether he was influenced by a secret and internal fear, for which there was no just cause.

11. The cases of *Mann v. Lewis, et al*, 3 W. Va. 215, and *Mann v. McVey*, 3 W. Va. 232, overruled.

*Supersedeas* to a judgment of the circuit court of the county of Pendleton, rendered on the sixteenth day of November, 1872, in a suit therein, then pending, in which Eli Simmons was plaintiff, and Jacob Trumbo was defendant, granted on the petition of said defendant.

The facts of the case are set forth in the opinion of this Court:

Hon. J. T. Hoke, Judge of said circuit court presided at the hearing below.

*A. C. Snyder* for plaintiff in error.

*W. H. H. Flick* for defendant in error.

GREEN, JUDGE:

This was an action of debt brought in the circuit court of Pendleton county, by Eli Simmons against Ja-

cob Trumbo, for $1,200. None of the proceedings at the rules appear in the record brought to this court, except that at August rules, 1872, the plaintiff filed his declaration, in which he alleges, that the $1,200 was due by two bonds, given by the defendant to the plaintiff, each for $600, payable on the first day of April, 1861, and on the first day of April, 1862. The first and second counts of the declaration, describe these bonds as given heretofore, to-wit: on the — day of —, 1859, and bearing date on that day, and also allege, that they are not paid in whole or part. The third count describes them as given heretofore, to-wit, on the — day of —, 1860, and as bearing date that day, but does not allege their nonpayment. No profert is made of these bonds, because they are stated to be in the possession of Jacob Trumbo, the defendant. The defendant craved oyer of the bonds, which was refused by the court, to which he excepted, he also demurred to the declaration, in which plaintiff joined, and the court overruled the demurrer. The defendant then as the record states, for further plea, says, "that he has well and truly paid the debts in the declaration mentioned, and the statute of limitations; and of this he puts himself upon the country, and the plaintiff likewise, and issue was joined." The jury found a verdict: "for the plaintiff for $1,067.50, the aggregate of principal and interest, which was found due on the debt in the declaration mentioned." And thereupon the defendant moved the court for a new trial, on the ground that the verdict was contrary to the law and the evidence. But the court overruled the motion, to which ruling the defendants excepted and prayed the court to certify the facts, which was, accordingly, done and the entry on the record states, that it was signed, sealed, and enrolled and made part of the record.

The facts certified, as all that were proven at the trial, are as follows: In 1860, the plaintiff sold the defendant land, who, thereupon, executed the bonds named in the declaration; that some time in the month of Decem-

ber, 1861, or February or March, 1862, the defendant offered to the plaintiff to lift the first bond of $600, and pay it off in Confederate money, which the plaintiff refused to accept, as he knew nothing about it. The defendant then said, "that it was as good as any money they had at that time; that it was the general currency; that it was more than the plaintiff dared do, to refuse it; that he was liable for refusing to take Confederate money, to be considered disloyal, and to be put in prison, and kept there during the war." The plaintiff still refused to accept the Confederate money. The next day the plaintiff, having, heard in the meantime, that there was a report circulating, to that effect, though told by his informant that he did not know whether it was true or not, concluded to accept, and did accept the Confederate money, and surrendered the bond to the defendant, he making still the assertion, which he made the day before. The plaintiff testified that he did so, "through fear of being considered disloyal, and of being arrested and imprisoned, and losing his debt, interest and perhaps principal"; that shortly after August, 1862, the defendant, Trumbo, refused to take of the plaintiff Confederate money, for $150, which the defendant had loaned him, but insisted that this $150 should be credited on the debt due from defendant to the plaintiff. Some time afterwards the plaintiff agreed to loan the defendant's father-in-law $300 in Confederate money. His bond for that amount, payable in Confederate money, was left by defendant's son with the plaintiff, but instead of taking the $300 which the plaintiff had on hand, it being a part of this $600 he had received, the son of the defendant rode off, and laughed, and said his father had let his grandfather have this $300, on the plaintiff's debt against the defendant. The plaintiff objected to this, and said he had agreed to advance the Confederate money. A third party claimed, in the fall of 1862, that the plaintiff owed him $180, and it being admitted that this third party owed the defendant, it was agreed between the

46

parties to allow this $180, as a credit on the last bond sued on, and this sum, and said sums of $300 and $150, amounting to the full amount of this last bond, principal and interest; the plaintiff surrendered it to the defendant, "though not agreeing to the transaction, but prefering to wait for times of peace, when the whole matter could be investigated"; these being all the facts, the court rendered judgment against the defendant for $1,067.50, with interest thereon from the sixteenth day of November, 1872, pursuant to the verdict of the jury. A *supersedeas* was awarded the defendant by a judge of this court, to this judgment.

The defendant having appeared, and filed his demurrer and pleas, thereby recognized this case as in the court, and waived thereby all defects in the taking of the rules, if any really existed. *Harvey v. Shipwith*, 16 Grat. 414. The court properly refused to grant the defendant oyer of the bonds, the excuse for not making profert of them, alleged in the declaration, that they were in the defendant's possession, being a sufficient excuse. *Smith's Admr. v. Lloyd's Ex.*, 16 Grat. 295. The court properly overruled the defendant's general demurrer to the entire declaration. For, though the third count was fatally defective, in failing to aver non-payment of the debt, (*Green v. Dulaney*, 2 Munf. 518), yet as the other counts were good, the demurrer to the entire declaration was properly overruled.

The objection to the first and second counts, that they do not sufficiently identify the bonds is not sound; for they not only give the amounts of the bonds, when payable, and to whom, but also their date—that is—————— day of——————, 1859, and thus these bonds are fully described. And, though, according to the averments of these counts, the bonds were blank in their dates; yet this would not vitiate the bonds, and the court, upon the demurrer, must assume that these bonds on their face had the day and month of their dates blank, and they are thus perfectly described in the declaration.

The defendant's assignment of error, that there was no replication to the plea of the statute of limitations, nor any issue upon this plea, are not well taken as grounds for reversing the judgment. The entry on the record, quoted above, shows that, by this entry, the plea of payment, and of the statute of limitations, are treated as together constituting one plea, on which the record says issue was joined. If these pleas had properly, each of them, concluded to the country, this entry would be held as equivalent to an issue on each of the pleas. *Gallego v. Moore*, 4 Munf. 60. But the plea of the statute of limitations, and payment, should have concluded with a verification, and issue could not have been joined upon them by adding a *similiter*, but only after a replication ; and this joinder of issue was, therefore, improper. But we think it must be regarded as a misjoinder of issue, which, after verdict, is covered by the statute of Jeofails. It is true that, at one time, it was held, in Virginia, that such an error was not cured by the statute of Jeofails, (see *Stow v. Thornton's admr.*, 1 Wash. 194, and *Williams' admr. v. Bennet*, 3 Munf. 314) ; but the contrary was subsequently held in *Moore v. Mauro*, 4 Rand. 488 ; and this decision apparently met the approbation of the court in the case of *Southside Railroad Co. v. Daniel*, 20 Gratt. 360. I think, therefore, this was a misjoinder of issue, cured by Code of Va. Ch. 181, Sec. — ; Code of W. Va. 1868, Ch. 134, Sec. 3.

It is insisted by the appellant, that evidence, tending to shew duress, was improperly admitted, under the issue, in this case. We incline to think that, even if objected to, the testimony tending to shew duress, in the receipt of Confederate money, should have been received under the issue joined in this case. But it is unnecessary to decide whether the evidence now complained of by appellant, ought, if objected to at the time, to have been permitted to go to the jury ; for, as the record does not shew that any objection was made to the reception of this evidence, it must be regarded as properly before the

jury, and as now properly before this Court.    On the other hand, the appellees insist that the proof of the payment of the first bond, as well as the proof of the three several payments on the second bond, and the surrender thereof as paid in full, ought to have been excluded from the jury, and should not now be considered by this Court, as no bill of particulars was filed, describing them.    We think that this proof ought to have been received, even if objected to at the trial.    There were no partial payments made on the first bond, the whole being paid at one time, nor was there, properly speaking, any partial payments made on the second bond; the three payments, now claimed to be partial payments, being treated and received as payments by the plaintiff, at one time—that is, when he surrendered this bond.    No bill of particulars need be filed, in order to admit proof of such general payments.    *Shanklin's admr. v. Crisamore*, 4 W. Va. 134.    No objection was made, at the trial, to the admission of this testimony, nor was any objection made by the appellant to the admission of any testimony.    The certificate of facts does not shew which party introduced any of the testimony, and, therefore, all the facts certified, must be considered by this Court.

The only remaining question is, should the court have granted a new trial?    In deciding this question this Court should not only consider all the facts certified, but also such facts as are matters of general history, affecting the whole people, of which the courts take judicial notice; such as that the late war was pending at the time these bonds were surrendered, having commenced in Virginia on April 27, 1861.    The Protector, 12 Wall. 100.    *Agnew v. Allston*, 15 Wall. 555; that Confederate notes were issued early in the war, by the Confederate Government, and that these notes, in a short time, became almost exclusively the currency of the the Confederate States; *Thorington v. Smith*, 8 Wall. 7; that at the time the first of these bonds was surrendered,

say, some time between December 1861, and March, 1862, Confederate notes were but slightly depreciated, and were received then, throughout the Confederate States, in the payment of debts, and in all the channels of trade, without doubt or question. *Myres v. Zetelle*, 21 Grat. 753; that the county of Pendleton was then, *de facto*, within the jurisdiction of the Government of Virginia, at Richmond, which adhered to the Confederate States, and not *de facto* within the jurisdiction of the restored Government of Virginia at Wheeling, the courts taking judicial notice of the territorial extent of the jurisdiction and sovereignty, exercised, *de facto* by their own government. I, Greenleaf on Evidence, Part 1, ch. II, sec. 6; and that lastly, Confederate notes were never made a legal tender in the payment of debts by the Confederate Government. *Thorington v. Smith*, 8 Wall. 13. It is true that, in the case of *Mann v. Mc Vey*, 3 W. Va. 238, the Court appears to have declined to take judicial notice of the fact that Confederate notes were never made a legal tender in the payment of debts, by any act of the Confederate Congress; but the same courts, in a case decided at the same term, took judicial notice of facts certainly far less known as matters of general history, if known as such at all, such as " Libby Prison and Castle Thunder were full of loyal citizens, whose only crime was loyalty to the Constitution and Union. *Mann v. Lewis*, &c., 3 W. Va. I think a court which takes judicial notice of this, as an historical fact, may properly take judicial notice of an historical fact, which affected the whole people, and is generally known to the people of the United States. I shall, therefore, disregard the decision, and follow the ruling of the Supreme Court of the United States, as I deem it a much safer guide, in this matter.

Before determining whether the jury were justified in finding that the bonds sued upon were surrendered under *duress per minas*, let us examine the law as to what constitutes such duress. Lord Coke says: "It must not be

a vain fear, but such as may befall a constant man ;" and Lord Denman, in *Skeate v. Beale*, 11 Adol., and Ell. 983, 39 Eng. C. R. 298, says: " The fear must be such as deprives one of his free agency, who possesses that ordinary degree of firmness which the law requires all to exert." The Supreme Court of the United States, in *Brown v. Pierce*, 7 Wall: 214, reviews the authorities, ancient and modern, and thus states the law in reference to duress : " Duress, in its more extended sense, means that degree of constraint or danger, either actually inflicted, or, threatened and impending, which is sufficient in severity, or, in apprehension, to overcome the mind and will of a person of ordinary firmness." Chitty on Contracts, 217 ; 2 Greenleaf on Evidence, 283. Duress *per minas*, as defined at common law, is where the party enters into a contract. (1). For fear of loss of life. (2). For fear of loss of limb. (3) For fear of mayhem. (4). For fear of imprisonment; and many modern decisions of the courts of that country, still restrict the operations of the rule within those limits. 3 Bacon's Abridgment, title, " Duress" 252. They deny that contracts procured by menace of a mere battery to the person, or of trespass to lands, or loss of goods, can be avoided on that account, and the reason assigned for this qualification of the rule is, that such threats are held not to be of a nature to overcome the mind and will of a firm and prudent man, because it is said that if such an injury is inflicted, sufficient and adequate redress may be obtained in a suit at law. Cases to the same effect may be found, also, in the reports of decisions in this country, and some of our text writers have adopted the rule, that it is only where the threats uttered excite fear of death, or of great bodily harm, or unlawful imprisonment, that a contract, so procured, can be avoided, because as such courts and authors say, the person threatened with slight injury to the person, or with loss of property, ought to have sufficient resolution to resist such a threat, and to rely upon the law for his remedy. *Skeate v. Beale*, 11

Adol. & Ell. 983 ; *Atlee v. Backhouse* 3 Meeson & Welsby, 642 ; *Smith v. Monteith,* 139d. 438 ; Shepherd's Touchstone 6 ; 1 Parsons on Contracts, 393. On the other hand, there are many American decisions, of high authority, which adopt a more liberal rule, and hold that contracts procured by threats of battery to the person, or the destruction of property, may be avoided on the ground of duress, because, in such a case, there is nothing but the form of contract, without the substance. *Foshay v. Ferguson,* 5 Hill 158 ; *Central Bank v. Copeland,* 18 Maryland 317 ; *Eadie v. Slimmon,* 26 New York 12 ; 1 Story's Equity Jurisprudence, 19 ed., 239 ; *Harmony v. Bingham,* 12 New York 99 ; S. C., 1 Duer, 229 ; *Fleetwood v. New York,* 2 Sandford, 475 ; *Tutt v. Ide,* 3 Blatchford 250 ; *Astley v. Reynolds,* 2 Strange 915 ; *Brown v. Peck,* 2 Wisconsin 277 ; *Oates v. Hudson,* 5 English Law and Equity 469.

Was the first bond surrendered under duress *per minas,* as above defined.

All that is relied on by the appellee, as proving that he was influenced by fear of imprisonment, is that the appellant, when he offered him Confederate notes in payment of the bond, said to him : " it was more than he dared do, to refuse to receive Confederate money in payment of the bond ; that he would be liable, for refusing to take it, to be considered disloyal, and to be put in prison, and kept there until the end of the war." This was said in a county over which the Confederate government then had jurisdiction *de facto.* Each of these parties, so far as the record shows, had equal opportunity to know what were the laws under which they were living, and by these laws no one was under obligation to receive Confederate notes in the payment of any debt, and, of course, no one could be considered to be disloyal for declining to receive them in the payment of any debt, or could, by so doing, render himself liable to imprisonment, or any other punishment. The record does not

1876.
August Term.

Simmons
v.
Trumbo.

show that there was then any military force of the Con-
federate government in this county, and, if there had
been, we could not presume, in the absence of any evi-
dence, that any military officer of the Confederate Gov-
ernment would, in violation of the laws of the Confed-
erate Government, order the arrest and imprisonment of
any man, simply because he declined to receive Confed-
erate money in payment of a debt; for, in issuing such
order, he would have obviously subjected himself to
punishment.

The appellant had no control of any military force,
and no influence with the Confederate authorities, civil
or military, which he might use against the appellee; he
could not have induced them, in violation of their own
laws, to imprison the appellee; he did not pretend to
have, or threaten to exercise, any such influence; he had
no power to imprison the appellee, and he did not threaten
to do so.   We must, therefore, regard the declaration of
the appellant, made at the time he offered to pay the first
bond in Confederate notes, as a foolish expression of
opinion, which ought not to have influenced any man of
ordinary intelligence and firmness, nor was the receipt,
at that time and place, of Confederate notes, in payment
of the debt, any evidence of imbecility of intellect, or
timidity of mind.   The court knows, judicially, that
Confederate notes were then but slightly depressed, and
were received, throughout the Confederate States, in pay-
ment of debts.   In truth, they were then far less depressed
than United States treasury notes afterwards, during the
progress of the war, became.   These Confederate notes,
when received by the appellee, were worth at least as
much, as compared with gold, as were United States
notes shortly after the close of the war.   The appellee,
in receiving them, only did what the great mass of the
people living in the Confederate States, uninfluenced by
fear, were then doing, daily.   The statement of the ap-
pellee, that he surrendered his first bond, " through fear
of being considered disloyal, and of being arrested, and

imprisoned, and losing his debt, interest, and, perhaps, principal," can make no difference. Lord Coke says: "In pleading fear, the defendant must show some just cause of fear; for fear, itself, is internal and secret." Co. Lit. 283, b. The real question is, was there, in fact, just cause of fear, not, was the party influenced by fear.

The surrender of the second bond was not even alleged to have been done through fear of imprisonment. When surrendered, in the fall of 1862, there was not only no threat made of any sort, but nothing was said, so far as the facts certified show, that could have excited fear in even the most timid; the appellee simply says, " that he gave up the bond, though not agreeing to the transaction, but preferring to wait for times of peace, when the whole matter could be investigated." It is not alleged that he so told the appellant; this purpose was " internal and secret." The surrender of the bond, as paid in full, showed, so far as the appellant could know, that he did agree to the transaction, and his secret purposes were immaterial. The fact, that he thought no more thereof, until seven years after the war closed, is evidence that this secret purpose was not of a decided character. It is true, that the manner in which the bond of the appellant's father-in-law, for $300, payable in Confederate money, was given to the appellee, indicates trickery on the part of the appellant, and the appellee properly objected there, to its being credited on this last bond, but some time afterwards, when this last bond was surrendered, his conduct indicates clearly that he had changed his mind. He appears then to have agreed to it, as a credit on the appellant's last bond, and it being there with other payments and offsets, fully satisfied, he surrendered the bond. In this transaction the appellee acted with full knowledge of all the facts, and must be held bound by his actions.

It is insisted, however, that this case should be ruled by the decisions in the court of *Mann v. Lewis*, &c., 3 W. Va. 215, and *Mann v. McVey*, 3 W. Va. 232. This

47

case not only differs in several particulars, but they are unsound in principle. In those cases, the appellees were Union men, and the appellants, sympathizers with the Confederacy, and this fact had a controlling influence with the court, as the opinion pronounced in those cases shew. It ought not to have had such controlling influence; for, in the absence of any evidence, the court ought to have assumed that a Union man had no more cause to fear imprisonment than a sympathizer with the Cenfederate States, provided he performed all his duties, and obeyed the laws, of the *de facto* government.

In the present case, it does not appear that the appellee was a Union man. We cannot infer this, merely from his reluctance to receive Confederate money in payment of a debt, especially as we find him offering to pay a debt of his own in Confederate notes; nor does it appear that the appellant was a sympathizer with the Confederacy. In those cases, the appellant told the appellee that the Confederate Congress had passed an act, making Confederate notes a legal tender, and the court relied strongly on this fact as proving duress or fraud. It ought not to have been relied on as establishing either duress or fraud, for it was a public fact, and each party had an equal opportunity of knowing whether it was true or false. In those cases, the bonds were surrendered in the latter part of 1863 and in 1864, when the court says Confederate notes were worthless, or nearly so. In the present case, the first bond was surrendered when Confederate notes were but slightly depreciated; in fact, worth as much as United States notes shortly after the close of the war. The court, too, in those cases, refused to make any allowance for the value of the Confederate notes received by the appellees, asserting that it was unlawful for the appellees to have here used, and passed, Confederate notes—a position repudiated by the Supreme Court of the United States, in *Thorington v. Smith*, 8 Wall., and also by this Court, in 6 W. Va. And, lastly, those

cases arose in the county of Greenbrier, when, in the opinion of the court, it would seem, that the condition of public affairs were such that the appellees, Union men, had no assurance that their rights, of person or property, would be respected. It is true, that the evidence in those cases would not seem to furnish any grounds for such conclusions, and the court seems to have rather drawn these conclusions from what they call historical facts, of which the Court takes judicial notice. Thus, they say, it is a matter of public history, " that a citizen, who was loyal to the Constitution and Union, and to the State of West Virginia, was not secure in standing upon the rights to which he was entitled, under the government and laws by which he is now tried. To discredit the contraband currency of the Confederacy, by refusing to receive it, under such circumstances, might have been hazardous to one not suspected, or chargeable, with loyalty to the Union, but to one of known loyalty, it was doubtless a cause of serious apprehension, when he might consider the historical fact, that Libby Prison and Castle Thunder were full of loyal fellow-citizens, whose only crime was their loyalty." We have no evidence in this case tending to show that any such state of affairs existed in Pendleton county, when these bonds were surrendered. And we hold, in this case, as we think the court ought to have held in those cases, that, in the absence of all evidence to the contrary, this court ought to have rather assumed that every man, whether a sympathizer with the Union, or with the Confederate States, was everywhere safe in his person and property, so long as he demeaned himself properly and obeyed the laws of the *de facto* government, under which he lived; and as no law required him to receive a particular currency, that neither his person or property could have been endangered by simply declining to receive such currency. If such was not the case, in any particular locality, this fact ought to have been proved, and not.

1876.
August Term.
——————
Simmons
v.
Trumbo.

been thus assumed by the court, as an historical fact, of which the court could take judicial notice.

The refusal of the court to set aside the verdict of the jury, and grant a new trial, and the judgment of the court, in accordance with the verdict of the jury, were erroneous, and must be reversed, and the appellant recover of the appellee his costs expended in this Court; and the verdict of the jury must be set aside, and a new trial awarded the defendant, the costs of the former trial to abide the event of the suit.

The other Judges concurred.

VERDICT SET ASIDE, AND NEW TRIAL AWARDED.