# Wheeling.

## EDWIN M. BROWN, *et al., vs.* JAMES WYLIE.

### January Term, 1868.

1. If the plaintiff in a bill of equity in his special prayer mistakes the due relief, it may be given under the general prayer, if consistent with that which is actually prayed. If inconsistent it cannot be obtained; and therefore, if a plaintiff doubt as to the proper relief, he may frame his prayer in the alternative, to have either one relief or the other as the court may decide. No relief can be granted under the general prayer entirely distinct from and independent of the special relief prayed.

2. W. sought the aid of a court of equity to enforce a supposed lien of a trust deed on certain real estate sold to B., and to stay waste on the same, and prayed for "such other and further relief in the premises as comports with equity and good conscience and is applicable to the case." HELD:

    That it was error for the court below to rescind a contract by deed, for the sale of the land between the parties, under the prayer of the special object of the bill, or the prayer for general relief.

3. The acts of persons claiming to act as officers under the authority of the usurped government at Richmond, within the county of Monroe, after the inauguration of the State of West Virginia, and who certified themselves to be officers of the said usurped government, are void in law.

4. A note made payable in Confederate money is illegal and void, and no payment of it can be enforced. Nor does it matter that it was made within the military lines of the late so-called Confederacy, as the question of illegality is to be tested not by the pretended authority and laws of the late insurrectionists, but by the laws of the lawful government of the country.

5. Where the parties to a contract to be paid in Confederate money, are *in pari delicto*, a court of equity will equally withhold its aid from the guilty party who would invoke it to get rid of such illegal contract executed.

6. W. sold a tract of land to B. and agreed to take Confederate money in payment. Over one-half of the money was paid in hand, and two bonds secured by a trust deed were executed for the residue. B., according to the terms of the contract, tendered the said residue to W., who refused to receive it. B. sold and conveyed the land to O. and T., who had no notice of the trust deed, (it having in fact never been recorded,) and no vendor's lien was retained in the deed from W. to B., and had no notice of any un-

paid purchase money that was a lien on the land. W. sought to enforce the payment of the residue of the purchase money against the land. HELD :

    1. That the whole contract to be paid in Confederate money, was illegal, but being an executed contract which was void as to every one else, yet had the effect to transfer the title to the land to B., the vendee of W.

    2. That the transaction being illegal, a court of equity will not lend its aid to enforce the payment of the purchase money notes secured by the trust, nor will it cancel them, but will leave the parties *in pari delicto* to rest in the condition in which they have placed themselves.

    3. O. and T. being complete purchasers without notice are entitled to hold the land free from the claim of W.

*James Wylie* sold to *Edwin M. Brown*, in the year 1863, a certain tract of land lying in the county of *Monroe*, where both parties then resided, containing 328¾ acres, at the price of 35 dollars per acre. The contract was reduced to writing, and stipulated that the money to be paid was to be Confederate States money. Seven thousand dollars were actually paid in hand, and the residue was to be secured by two bonds of equal amounts, which on their face expressed that they were to be paid in Confederate money, due in one and two years, and payable before maturity at the option of the purchaser.

On the 4th day of December, 1863, *Wylie* and wife executed a deed to *Brown* for the 328¾ acres of land, and *Brown* executed a trust deed on the same to secure the payment of the residue of the purchase money, which was the two bonds, before mentioned, of 2,253 dollars and 25 cents, and 2,253 dollars, respectively. The former deed was acknowledged before two parties, purporting to be justices of the peace, named *Fielding Windle* and *Michael Beamer*, and was admitted to record in what purported to be the clerk's office of the county court of *Monroe* county, by a party signing himself as clerk, one *G. W. Hutchinson*, on the 9th day of April, 1864. The trust deed was acknowledged before the same clerk, on the 19th day of March, 1864, but was not admitted to record in fact. The latter deed was executed to one

*Andrew Prentice,* trustee.   By subsequent deeds *Brown* conveyed the land to *Jacob Osborne* on the 26th day of July, 1864, and to *David Tomlinson* on the 7th day of August, 1865, to the latter about 112 acres, and all of the residue to the former.          •

On the 31st of August, 1865, *Wiley* obtained an injunction from the judge of the circuit court of *Monroe* against *Brown, Osborne, Tomlinson* and one *Henry J. Kelley,* restraining them from cutting timber or committing waste on the land, alleging that they were despoiling it to such extent that the trust fund of 4,506 dollars and 25 cents, the amount embraced in the two bonds, was being endangered.    At the September term following, *Osborne* and *Tomlinson* filed their separate answers, and gave notice to dissolve.    They denied all knowledge of any deed of trust, and that they examined the deed from *Wylie to Brown* and found no lien therein retained according to law.    That they had examined the records and had not found any deed of trust recorded, and were informed by the person assuming to act as clerk that no trust deed was of record, as alleged in complainant's bill.    That complainant charged in his bill that he held a deed of trust executed to one *John Hutchinson,* to secure the bonds due, but that no such trust deed was of record, nor in fact that any trust deed on the land in controversy from *Brown* to any person was recorded.

At the November term following, *Brown* answered, stating the contract heretofore set out and that it was destroyed by the Federal army in 1864, but that a copy of it was in the possession of the complainant.    That in pursuance of the option in himself of paying the two bonds off before maturity, to-wit, November 15th, 1864 and 1865, respectively, he tendered the amount thereof with interest, but that *Wylie* refused to receive it; 'and he claimed that thereby the bonds were paid off and he owed the complainant nothing, and consequently sold to *Osborne* and *Tomlinson.*

*Wylie* filed an amended and supplemental bill, alleging that both the bonds had become due and that they were a specific lien on the land; that the deed from himself to

*Brown* was void by reason of not being stamped by a U. S. revenue stamp, and from the further fact of not being acknowledged before competent officers nor recorded by competent officers.    That the deeds from *Brown* to *Osborne* and *Tomlinson* were void for like reasons.    That the deed of trust from *Brown* to secure the two bonds was valid, because after it was executed and acknowledged before the clerk of *Monroe* county, it was withdrawn by *Brown* and altered by him by substituting the name of *John Hutchinson* as trustee in lieu of *Andrew Prentice,* and that he did not know whether it was ever put upon the record or not.    That *Brown* was probably insolvent, and that the defendants were engaged, prior to the granting of the injunction, in stripping the land of timber, &c.

*Brown* answered, denying the invalidity of the deed from *Wylie* to himself for the reasons assigned by him; he stated that the complainant would not receive the trust deed with *Andrew Prentice* as trustee, but required him after he had so acknowledged it before the clerk, to erase his name and substitute that of *Hutahinson,* and that he never afterwards reacknowledged it.

It is unnecessary to give any of the evidence taken in the cause, as the points determined by this court did not arise on controverted questions of fact, except that it was proven by *G. W. Hutchinson,* the person assuming to act as clerk, that defendant *Osborne* inquired at his office to know whether there was any lien by trust on the record and was informed that there was not; and that there was no other authority exercised in the county of *Monroe* from 1861 to May, 1865, except that of Virginia and the Confederate States.    It is proper, however, to notice the item that the tender of the money by defendant *Brown* to *Wylie* in discharge of the two bonds was proven.

The court below, at the August term, 1866, decreed that the bonds of *Brown,* having been founded on an illegal consideration be cancelled; that the deeds of bargain and sale and of trust, for a similar reason, be cancelled, and that the complainant *Wylie* recover possession of the land sold by

him to *Brown*, by writ of possession, which was awarded, but did not settle any questions between *Brown* and his vendees *Osborne* and *Tomlinson*. *Brown, Osborne* and *Tomlinson* appealed to this court from this decree.

*Lee & Edmiston* for appellants.
*Stanton & Allison* for appellee.

BROWN, President. Several questions arise in this case and will be considered in order.

The bill sets forth a sale and conveyance of land, part of the price paid down, and a trust deed on the land to secure the bonds given for the residue of the purchase money. The prayer is for a sale of the trust subject to pay the debt and for "such other and further relief in the premises as comports with equity and good conscience and is applicable to the case."

The first question is, will this warrant a decree rescinding or rather avoiding the whole contract. The rule is briefly and tersely stated in Adams' Equity, 309. If the plaintiff in his special prayer mistake the due relief it may be given under the general prayer, if consistent with that which is actually prayed. If inconsistent it cannot be obtained, and, therefore, if the plaintiff doubt as to the proper relief he may frame his prayer in the alternative, have either one relief or the other as the court shall decide. No relief can be granted under the general prayer entirely distinct from and independent of the special relief prayed. Every fact essential to the relief sought must be stated in the bill, for no facts are properly in issue unless charged in the bill; no proof can be offered of facts not stated; nor can relief be granted of matters not charged, although apparent from other parts of the pleading and evidence, for the court pronounces its decree *secundum allegata et probata*. The reason of this is that the defendant may be apprized by the bill what are the charges he is to answer or defend. Story's Equity Pleading, section 257; and 1 Dan'l Chy. Prac., 435, and the authorities cited in the argument. The relief

granted under the prayer for general relief must not only be sustained by the facts stated in the bill, but must also be consistent with the special relief prayed for. Tested by these principles how does the present case stand? The facts stated in the bill for specific performance, and a special prayer for same are inconsistent with relief granted, viz: a rescission or avoidance of the contract, and such as it was error to grant under the prayer for general relief in such case, however proper such relief might have been upon a proper case stated.

Another point is whether certain persons were officers and their official acts valid, who were duly elected and qualified as justices of the peace, in and for the county of Monroe, and another as clerk of the circuit court of said county, under the laws of Virginia prior to the 17th day of April, 1861, and whose offices, but for the rebellion and their complicity in it, would not have expired, under the laws of Virginia, till after 1864, but which persons after the inauguration of the State of West Virginia, in 1863, performed official acts in said county in 1864, assuming and certifying themselves to be such officers, respectively, not of the restored government of Virginia, holding over and acting under the authority of the ordinance of February 19th, 1863, until their successors were appointed and qualified, nor under the authority of the State of West Virginia, but as officers of the usurped government at Richmond. That such persons so acting were not officers either *de jure* or *de facto* has been repeatedly determined by this court, nor were their acts as such valid or effective to any intent, but on the contrary utterly void in law. *Hood* vs. *Maxwell*, 1 West Virginia, 219, and *Hedges* vs. *Michael*, *Williams* vs. *Freeland*, *Nadenbousch* vs. *Sharer*, *Hawver* vs. *Seldenridge*, and *Burkhart* vs. *Jennings*, reported in 2 West Virginia. In other words the 6th section of the ordinance of February 19th, 1863, only applied to the officers of the restored government of Virginia, within the limits of the new State, who held their offices and exercised the authority thereof, under the authority and in harmony with the said government, and not to those who

assumed to act under the authority and in the interest and aid of the usurpation at Richmond, which they called the government of Virginia.

Another point is whether a note payable in the so-called Confederate paper is illegal and void. This paper issued from parties combined to overthrow the lawful government and with the intent by that instrumentality in part, of effecting the treasonable object. It only professed to be payable in the event of the successful accomplishment of that object. . It was the life blood of the rebellion, an unlawful means to an unlawful end, by the parties engaged in the unlawful enterprise, and appealed directly to the interest of every holder to aid in its accomplishment. It was *contra bonos mores* and against sound policy, and of only evil tendency, and was, therefore, illegal. I think the circuit court of Monroe so far as it held the contract payable in Confederate money, so called, to be illegal and void, pronounced the law correctly. In the case of the *Bank of Tennessee vs. the Union Bank of Louisiana,* American Law Review for January, 1868, it was held by the United States circuit court for Louisiana, that the formation of the government of the so-called Confederate States was unlawful, and the emission of bills of credit by it was unlawful; that the Confederate treasury notes issued and circulated as money were bills of credit within the meaning and prohibition of the constitution, and therefore an unlawful issue, and that all dealing in such notes was unlawful, and all obligations arising therefrom or founded thereon were also unlawful and without legal consideration. In the case of *Campbell vs. Anderson's adm'r,* 2 Duvall, 384, C. placed Confederate notes or bonds in the hands of A., with which to buy cotton. A. was to re-sell the cotton so bought, and, after deducting costs and commission, to pay over to C. the proceeds. In an action by C. to recover such proceeds, held, that the contract was against public policy and could not be enforced. In *Spencer vs, Wilson,* 1 Rand., 76, all dealings in unchartered and illegal bank notes are held void. It is contended, however, that inasmuch as the contract in question was en-

tered into before the close of the war, within that part of the
State where the insurgents had sway by a military force
which the lawful government was not then able to over-
come, that it is, therefore, lawful, because authorized by
the, for the time, dominant authority of the so-called Con-
federacy, and that being so lawful at the time the contract
was entered into by the parties while under such domina-
tion, it could not become unlawful by the subsequent tri-
umph of the lawful government and restoration of its au-
thority and laws.    But the fallacy is in supposing the ille-
gality is to be tested by the pretended laws of the insurgent
authorities, instead of by the laws and authority of the law-
ful government.   The two cannot stand together.   It would
be a strange anomaly if the authority of the lawful govern-
ment upon being fully restored should be used in executing
acts done in conformity to the pretended laws of a hostile
combination to subvert its authority, and in violation of its
own laws.   The fact, therefore, that the insurgents held sway
in Monroe county, at the date of the contract, cannot relieve
the transaction of its illegal character, as tested by the laws
of this State, and which alone the courts sit to administer as
applicable to the dealings of the parties who are and were
subject to their control.   The courts of this State cannot
recognize as operative within her limits the authority and
laws of other States, much less the authority and laws of a
temporary and insurrectionary usurpation.

   I am of opinion, therefore, that every contract payable in
the so-called Confederate paper, or the consideration of
which was such paper, is void in law, and a court of equity
will not lend its aid to enforce its execution, and when the
parties to it are *in pari delicto*, as in this case, the court will
equally withhold its aid from the guilty party who would
invoke it to get rid of such illegal contract executed.

   Applying these principles then to the case under consid-
eration, I am of opinion that the sale and conveyance of the
land by Wylie to Brown to be paid for in Confederate money
so-called, was an illegal, but, nevertheless, an executed con-
tract, which though void as to everybody else, yet had the

effect to transfer the title to the land to the vendee. *Inhabitants of Worcester* vs. *Exton*, 11 Mass., 375; *Brookover* vs. *Hurst*, 1 Metcalf, Ky., 667; and a court of equity will not lend its aid to the guilty vendor to protect him from the consequence of his own illegal act, or aid him to recover back the land so conveyed away. I am further of opinion that the notes given for the purchase money of said land payable in Confederate money so-called, and the trust deed to secure them were illegal and void, and that a court of equity will not lend its aid to enforce the payment of them, either by decreeing payment of them or selling the land for that purpose, neither will it lend its aid to the maker of the notes to have them cancelled, but will leave the parties *in pari delicto* to rest in the condition in which they have placed themselves.

I am further of opinion that Jacob Osborne and David Tomlinson being complete purchasers, without notice from Brown, are entitled to hold the land free from the claim of said Wylie.

I think, therefore, that the decree of the circuit court should be reversed and the bill dismissed with costs to the appellants in both courts.

The other judges concurred.

DECREE REVERSED, and bill dismissed.