DAVE GIDEON *v.* PUTNAM DEVELOPMENT COMPANY, *et al.*

(No. 8681)

Submitted January 31, 1939. Decided February 14, 1939.

*Fitzpatrick, Brown & Davis, Walter L. Brown,* and *Jackson N. Huddleston,* for appellant.

*Frank Lively* and *George S. Wallace,* for appellee.

HATCHER, JUDGE:

This is a sequence in the chancery cause of *Gideon* v. *Putnam Development Company et al.*, decided here on December 12, 1932, and reported in 113 W. Va. 200, 167 S. E. 140. From the opinion it will appear that in 1924, Gideon and others executed a deed of trust on certain land in Huntington to secure a loan from Western & Southern Life Insurance Company (hereinafter called the Company); that in January of 1932, payments required by the trust deed, including taxes, being in arrears, the Company sought to have the land sold by the trustee, and that this Court enjoined the sale except in compliance with a contract between Gideon and the Company, made in 1931, whereby he was to acquire the title to the land in his own name, and the Company would accept his personal note, secured by his deed of trust on the land, for the amount due under the terms of the existing deed of trust, including delinquent taxes.

This contract was not executed. The land was sold by the trustee on April 6, 1933, and bid in by the Company. It then paid the delinquent taxes; and later filed a supplemental pleading in the above cause seeking to recover this payment from Gideon, under a covenant in the deed of trust obligating him and associates personally to pay the taxes. The circuit court found against the Company.

Further details of what transpired after our former decision follow. The circuit court entered a decree on February 21, 1933, directing sale of the land (under the trust deed), and, at the instance of the Company, requiring Gideon to elect in writing within twenty days which of certain alternative plans submitted by the Company for consummating the contract of 1931, he would adopt. (The main difference in the plans was in the amount of unpaid taxes to be included in the loan.) He made his election in a letter delivered to counsel for the Company on March 10th, which also stated: "And this letter is to be treated as a formal application to the Western and Southern Life Insurance Company for said loan. If it is desired that a

formal application be made on any blank or form in use by your company, I respectfully ask that you furnish me with such form and I will forthwith fill out said blank according to the requirements, if any, of your company." Publication of notice that the land would be sold on April 6th was commenced on March 10th. Counsel for the Company testified that on April 4th, he mailed Gideon a letter enclosing formal application blanks, and requiring a supplementary financial statement (not mentioned in the accepted plan). Gideon testified that he did not receive this letter, that he had no communication whatever from the Company between March 10th and April 6th (the day of the sale), and that he did not recall any conference with the Company's executives after April 6th. The executives testify, however, that he did confer with them at the Company's office in Cincinnati on April 7th, and his counsel concede the conference. Its substance, according to the executives, was that Gideon desired to proceed with their plan, which he had accepted on March 10th; that they regarded the Company as still bound by that acceptance, and "all agreed to proceed on that basis"; that he was hopeful the legislature, then in session, would within two weeks materially reduce the amount of the delinquent taxes on the land—a reduction to the advantage of the Company as well as him; that the deal could not be finally concluded until the amount of the delinquent taxes was definitely determined; and that as soon as Gideon "was in position to submit some definite figures as to the amount of loan desired", he should advise them, return to Cincinnati and close the deal. The Act affording some relief to delinquent taxpayers was not passed until June 13th. On that day Gideon wrote to an executive of the Company that the legislature had acted and he (Gideon) would go to Charleston the next week to ascertain the total amount of taxes due. This letter was not answered. On June 29th, counsel for Gideon wrote counsel for the Company, after referring to the Company's plan accepted on March 10th, that Gideon "was ready to go ahead with his part of the program

and we would like to get it closed up as early as possible." On July 15th counsel for the Company replied that it was "under no further obligations to Mr. Gideon." The Company's executives base its position on the failure of Gideon to communicate with them in two weeks after the Cincinnati conference of April 7th.

Counsel for the Company advance four propositions, which will be separately quoted and discussed, as numbered.

1. "The agreement for a loan was expressly conditioned upon Gideon (as a preliminary matter) acquiring title to the property at the sale under the deed of trust." Were the agreement to be construed solely by its terms, this proposition might be forceful; but it is precluded by the situation of the parties and by their own construction of the agreement. When it was drawn, Gideon personally had neither ready money nor other available means for acquiring the trustee's title. Gideon's purchasing limitations were fully known to the Company. So the only way for the agreement to have become effective—which we must assume the parties intended—was for the Company to cooperate with Gideon, either directly or indirectly, in acquiring the title. He construed the agreement to contemplate cooperation, as shown by his letter of March 10, 1933. Counsel for the Company construed the agreement likewise, as shown by his letter of April 4th (presumably treated by the circuit court as undelivered). The executives of the Company construed the agreement in the same manner, as shown by their expressions on April 7th, which further showed that they had not regarded it incumbent on Gideon to acquire the trustee's title directly.

2. "There was no enforceable agreement made with Gideon at Cincinnati on April 7th." He does not claim so; he relies generally on the contract of 1931 and specifically on his acceptance, March 10, 1933, of the Company's plan for executing the contract, which acceptance was treated by the Company's executives, on April 7th, as still binding it.

3. "Appellant was at all times ready and willing to make the loan agreed upon and there was never any breach of its agreement." This position is not sustained by the record. The Company repudiated the original agreement until forced to recognize it by this Court; the Company did not comply with Gideon's request of March 10, 1933, to treat his letter as a formal application for the loan or otherwise cooperate with him effectively prior to the trustee's sale regarding the loan; and after the Cincinnati conference, where the Company had agreed to proceed on the basis that the contract was still in force, and the deal could be closed when Gideon "was in position to submit some definite figures as to the amount of loan desired", (definite as to the amount necessary to pay the delinquent taxes) the Company refused to treat with him when he was in that position. We are cognizant that our former opinion required Gideon to proceed promptly. He did so in making his election of the plans proposed by the Company. He could then proceed no farther until the Company took a coordinate step. And after the Company had virtually agreed at the Cincinnati conference for the deal to bide legislative action on the delinquent taxes, the Company could not charge to him the legislative impromptitude, if such it was.

4. "Even if appellant had breached the agreement for the lending of money to Gideon that fact would offer no defense upon the covenant to pay taxes." The agreement arranged for the payment of taxes and therefore novated the covenant (so far as it affected Gideon). Its significance was not restored for the benefit of the Company by its own breach of the novation. That breach relates (in part) directly to the payment of taxes, the matter in controversy here. In such case, a court of equity will not aid the contract breaker.

The decree is affirmed.

*Affirmed.*