WHEELING DOLLAR SAVINGS & TRUST COMPANY, *Receiver, etc. v.* JOHN H. HOFFMAN, *Receiver, etc.*

(No. 9652)

Submitted April 24, 1945. Decided June 26, 1945.

778

*Joseph R. Curl, Charles L. Ihlenfeld* and *Russell B. Goodwin,* for appellant.

*Austin V. Wood* and *Wm. J. Gompers,* for appellee.

ROSE, JUDGE:

L. F. Haller, as receiver of Homeseekers Fire Insurance Company, instituted this suit in the Circuit Court of Ohio County against O. H. Gall as receiver of Wheeling Savings & Loan Association to have the sum of $115,-073.25 of the insurance company, alleged to have been placed in the Loan Association illegally by its secretary-treasurer, declared a trust fund in favor of the plaintiff, or, if not a trust fund, to constitute a debt due the plaintiff, and for general relief. The defendant answered alleging that the money in question was paid to and accepted by the Loan Association in purchase of instalment stock of the Association. During the progress of the suit Wheeling Dollar Savings & Trust Company succeeded Haller as receiver of the Insurance Company and John H. Hoffman became the successor of Gall as receiver of the Loan Association.

On the issues made evidence was taken at the bar of the court and the cause submitted for decision. The chancellor found for the plaintiff in the amount of $105,519.27 as a debt owed by the defendant to the plaintiff and entered a decretal judgment therefor, to be paid by the defendant pro rata from assets in his hands available for application on such debts. This appeal followed.

While neither fraud nor "unclean" hands was pleaded, the defendant strongly relies on these defenses here, as he may do. Such defense requires no pleading. Whenever and if it is made to appear to the court that by reason of fraudulent or other unconscionable conduct, the plaintiff has lost his right to invoke a court of equity, the court will, on the motion of a party, or its own motion, wash its hands of the whole. *State* v. *Altizer Coal Land Company*, 98 W. Va. 563, 128 S. E. 286. "The unconscionable character of a transaction between the parties need not be pleaded or set up as a defense. Whenever it is disclosed the court will of its own motion apply the maxim. It does not matter at what state of the proofs or in what order a lack of clean hands is discovered. A party cannot waive application of the clean hands rule

at the instance of the court, nor does such application depend on the wish of counsel. * * *". 30 C. J. S., Equity, section 97.. Nor is a court of equity compelled to act as umpire in a controversy growing out of transactions in which both parties are equally guilty of fraudulent or otherwise unconscionable conduct in connection with the matter of litigation, but will leave them where they have placed themselves. *George* v. *Curtis,* 45 W. Va. 1, 30 S. E. 69; *Rock, Admr.,* v. *Mathews,* 35 W. Va. 531, 14 S. E. 137; *Brown* v. *Wylie,* 2 W. Va. 502. These basic rules of equity were not devised, and are not applied, for the benefit of either litigant, but exist for the purpose of maintaining the dignity and integrity of the court acting only to administer equity. When not equity, but inequity, is shown to be the basis of a suit, the litigation has no place in a court of equity, and when both parties are equally besmirched the whole procedure will be dismissed without further decree and without regard to the desire of the parties.

Throughout the taking of evidence the question of fraud seems to have been constantly obtruded into the case. Much evidence in the record is otherwise wholly irrelevant. In the end, the chancellor decided to entertain the cause, and did adjudicate on its merits. In view of the basic character of this question we direct to it our first inquiry.

The Homeseekers Fire Insurance Company and the Wheeling Savings & Loan Association are closely interlocked in history, in officers, in management and in operation. The latter company was organized in 1919. In 1922 another corporation, the Real Estate Finance Company, was organized, with identical officers, directors and management. In 1924 the same group organized the Homeseekers Fire Insurance Company, also with the same directors, officers and manager. The latter company had an authorized capital of $200,000, of which one-half was issued at a premium of $25,000. Of this subscription $21,500 was by the Real Estate Finance Company with money borrowed from the Loan Association.

This paid-in capital of $125,000 was left in the Loan Association, and is the beginning of the account in controversy. This account has always been carried on the books of the Insurance Company as a cash account, while on the books of the Loan Association it has always been shown as a payment for instalment stock in that corporation. These books were set up and always supervised and controlled by one Reass, who, through the life of the corporations was the executive manager of each, first as secretary-treasurer until a few months before the receiverships, when he became executive vice president, with his son as secretary-treasurer.

The receiver for the Loan Association was appointed by the Commissioner of Banking in 1936, and the Circuit Court of Ohio County appointed receivers for the Insurance Company and the Real Estate Finance Company at about the same time. This suit was instituted July 28, 1936. The final decree was entered March 18, 1944.

The account in question, from its beginning, has been subject to debits and withdrawals, much as an ordinary bank account. By 1929 the balance to the credit of the Insurance Company was reduced to a nominal amount, at which time additional stock of that corporation was sold, realizing $78,750, which was again left with the Loan Association in this account. Of this stock $51,125 was purchased by the Real Estate Finance Company with money borrowed from the Loan Association without security except the stock purchased. By 1931 this balance was again practically exhausted, since which time it has been built up to $115,073.25, the amount sued for.

The controlling directors and officers of the three corporations have always been identical. The offices of the three corporations were maintained in a building owned by the Loan Association, which occupied the first floor, with the offices of the other two corporations on the second floor. Some employees worked for more than one of the corporations, and a common fidelity bond covered certain of the employees of all three.

The chief clerk of the Loan Association testifies that

"the biggest mortgages we had were the Real Estate Finance Company and we had to keep that institution open". When the receiver of the Loan Association closed the books, the Real Estate Finance Company was indebted to the Loan Association in the amount of $149,-711.45, and owned approximately 53% of the stock in the Insurance Company. This indebtedness may be assumed to be at least largely uncollectible, since the representative of the receiver of the Loan Association testifies that if the plaintiff's claim is paid nothing will remain to be paid to stockholders or other creditors of the Association.

At a meeting of the directors of the Insurance Company on January 5, 1935, the secretary reported "that the public continually had the three companies confused as one organization" and that he "felt obliged to resign". At a joint meeting of the three corporations it was resolved to turn the affairs of all three companies over to one Salvatori to manage, control, reorganize or liquidate.

For the four or five years covered by the evidence the common secretary-treasurer made up and submitted to the Insurance Commissioner of this State, as well as those of Ohio and Indiana, reports showing this account as cash due from the Loan Association, and during the same period made reports on behalf of the Loan Association to the Commissioner of Banking of this State showing the same account as representing instalment stock therein. These reports were sworn to by the secretary-treasurer and by three or more directors.

Both these accounts, as they appear on the books of the two corporations, cannot be true; one or the other must be false, possibly both. The inconsistency between the two accounts is not in items, but in their fundamental character; is systematically and unbrokenly preserved, and was created and preserved by the common manager of the corporations. It is, therefore, chargeable to the officers and directors of each, either through actual knowledge or the gross ignorance or neglect of their official duties, and, hence, to the corporations themselves. The rights of the respective receivers rise no higher than those of the corporations which they represent.

No legitimate purpose can be attributed to the double aspect of these accounts. No innocent intention on the part of the principal actor is conceivable. The object clearly was to deceive those interested in the business of the corporations, and fraudulently to mislead the Commissioner of Banking of this State, and the insurance departments of this and other States, to the end that the corporations, their stockholders and creditors, might be deprived of the benefits of proper official investigation and supervision. In fine, the whole system of accounts between these corporations and the official reports made on their behalf seem to be permeated with deliberate fraud.

Many times has this Court recoiled from situations less revolting and refused to the party invoking its aid any character of relief. *Gideon* v. *Putnam Development Company*, 121 W. Va. 46, 1 S. E. 2d 399; *State v. Altizer Coal Land Company, supra; Chicago Towel Company* v. *Reynolds*, 108 W. Va. 615, 152 S. E. 200; *Pittsburg Splint Coal Company* v. *Shackleford*, 86 W. Va. 356, 103 S. E. 123; *Hall* v. *Hall*, 69 W. Va. 175, 71 S. E. 103; *Poling* v. *Williams*, 55 W. Va. 69, 46 S. E. 704; *Craig* v. *Craig*, 54 W. Va. 183, 46 S. E. 371. A court of equity will not besmirch itself by acting as arbiter between parties whose controversy arises out of joint participation in transactions which are fraudulent or unconscionable. "Where a contract has been made to accomplish a fraudulent purpose, a court of equity will not at the suit of a party to the fraud,—a *particeps doli*,—if the contract is executory, either compel its execution or decree its cancellation, nor, after it has been executed, set it aside and thus restore to the plaintiff the property or other interest, which he has fraudulently transferred. It will leave the parties in the position, in which they have placed themselves." *McClintock* v. *Loisseau*, 31 W. Va. 865, 8 S. E. 612.

A more revolting aspect of the case appears from the immediate transaction by which the balance of $116,-519.27 in favor of the Insurance Company was created. This balance was largely built up from the notes of the

Loan Association, transferred to the Insurance Company, at some time not shown by the record, which were turned back to the Loan Association after becoming in default.

A serious question as to the legal right and power of an insurance company to hold and collect typical building and loan association notes, with their higher interest, premiums, dues and fines, must at once arise. At any rate, the Loan Association always continued to make collections on the notes while held by the Insurance Company and to credit its account accordingly. There is no evidence to show that the Loan Association, by indorsement, guaranty, or otherwise, was liable thereon, and no evidence that any record or report was ever made of such liability. Witnesses speak repeatedly of these notes as having been "sold back" to the Association, not of their having been collected from, or taken up by, it. The president of the Insurance Company, who took office in 1933, testifies that he continuously endeavored to have this account liquidated, and that after he became president "there wasn't enough money in both companies that they could buy anything". The Deputy Insurance Commissioner of this State testifies that upon discovery, in the early part of 1934, of this purported large balance due from the Loan Association, he made demand on the manager of the Insurance Company that the bulk of this balance be withdrawn and otherwise invested. Nevertheless, the common executive continued to increase the account to almost double this balance. A loss of $78,099.50 was suffered by the Association on notes charged back to it at par after 1932. One item transferred to the Association during this period was a worthless check of the Real Estate Finance Company, payable to the Insurance Company, for $11,000, given, not for the purpose of being cashed, but to create a fictitious appearance of the required legal reserve held by the Insurance Company.

Dealings between corporations controlled by common officers and directors are not unlawful, but such transactions require close scrutiny in a court of equity, and are voidable. If the appearance of fraud exists, equity

will refuse its aid in the enforcement of the contract. *Corsicana National Bank of Corsicana* v. *Johnson,* 251 U. S. 68, 40 Sup. Ct. 82, 64 L. Ed. 141; *Guthrie* v. *Huntington Chair Co.,* 71 W. Va. 383, 76 S. E. 795; and a very general, though not universal, rule is that the burden is on the party seeking to enforce such a contract to prove good faith and fair dealings. *Sweeny* v. *Sugar .Refining Co.,* 30 W. Va. 443, 4 S. E. 431; *Corsicana National Bank of Corsicana* v. *Johnson, supra; Ohio & M. Railway Co.* v. *McCarthy,* 96 U. S. 258, 24 L. Ed. 693; *Irving Bank-Columbia Trust Co.* v. *Stoddard,* 292 Fed. 815; *Kennerly* v. *Columbia Chemical Corp.,* 137 Va. 240, 119 S. E. 265; *Ellermon* v. *Chicago Junction Railways & Union Stockyards Co.,* 49 N. J. Eq. 217, 23 A. 287; *Eastern Shore Brokerage & Commission Co.* v. *Harrison,* 141 Md. 91, 118 A. 192; *Geddes* v. *Anaconda Copper Mining Co.,* 245 F. 225; *Bentley* v. *Zelma Oil Co.,* 76 Okla. 116, 184 P. 131; *City Trust Co. of Omaha* v. *Bankers' Mortgage Loan Co. of Omaha,* 102 Neb. 532, 167 N. W. 785; *Barrie* v. *United Rys. Co. of St. Louis,* 125 Mo. A. 96, 102 S. W. 1078. "The general rule is that the burden of proving that a contract between corporations, having in common the same manager or directors, is fair is on the party who would sustain such contract." 6 Fletcher, Cyclopedia of Corporation Law, 365, section 2586. We approve this rule. The charging of the worthless $11,000 check of the Real Estate Finance Company to the Loan Association by the common manager was clearly fraudulent. The transfer at face value of the notes, largely worthless, while both corporations were clearly insolvent, and which made up the larger part of the balance sought to be collected, is highly suspicious and was, in no sense, explained or justified, and was a part of the general scheme and practice of which the worthless check was merely one item, and presumably was similarly contaminated. Such degree of "unclean hands", and such evidence and such high probability of fraud in the whole subject of this litigation, requires equity to refuse consideration of the plaintiff's bill.

The propriety of our conclusion will further appear from the exceedingly narrow scope of the pleadings and

issues raised, the absence of the parties ultimately most vitally interested, and the limited evidence before us, by which any decision on the merits of this case becomes highly hazardous. The only substantial evidence introduced by the plaintiff were the books of the two corporations, which clearly show the lack of integrity, with the explanatory testimony of the chief bookkeeper of the Insurance Company, who testifies that she acted only under the directions of the common officer of the two companies. No officers or directors were called except the respective presidents of the two corporations and one common director, who do little more than to assert ignorance and innocence. Any decree, therefore, which might be made in favor of either party in this suit might prove to be grossly inequitable when, in a final liquidation of these corporations, the full facts are discovered.

The decree appealed from will be reversed and the bill dismissed.

*Reversed and dismissed.*

NOTE: The foregoing opinion was prepared by Judge Rose and approved by the Court prior to his last illness and is announced in his name.