# CHARLESTON.

STANDARD ISLAND CREEK COAL COMPANY v. THE SHAMROCK COAL COMPANY.

Submitted September 14, 1920.   Decided September 21, 1920.

1.   MINES AND MINERALS—*Coal Company's General Manager Has No Implied Authority to Dispose of Leasehold Estate; Coal Company Ratifying Manager's Unauthorized Act, Estopped to Deny Authority.*

   The general manager of a coal company has no implied authority to dispose of or incumber to another company any part of its leasehold estate, nevertheless, when done upon good consideration accruing to it, and his principal by subsequent acts and conduct ratifies his unauthorized acts, it is thereby estopped to deny his authority. (p. 678).

2.  SAME—*Coal Company Held Not Entitled to Enjoin Other Party to Contract from Maintaining Break-throughs on its Side of Division Line.*

When such a contract, made by a general manager, involves the settlement of a claim for damages against his company for coal taken from adjoining land of the other party to the contract, and for the penalties incurred by his company for removing barrier coal, and it is agreed as a consideration therefor that the other party to the contract may also mine its coal up to the division line and allow the water in its mine to drain through the mine of his company, equity will not at the suit of his company enjoin the other party to the contract from making or maintaining break-throughs in the coal on its side of the division line for the purpose of such drainage. (p. 679).

3.  EQUITY—*Equity Will Deny Affirmative Relief to Either Party to Illegal Contract.*

If such a contract be illegal, whether because *malum in se* or *malum prohibitum*, a court of equity will deny affirmative relief to either party and leave them where it finds them. p. 680).

(WILLIAMS, PRESIDENT, absent.)

Appeal from Circuit Court, Logan County.

Suit for injunction by the Standard Island Creek Coal Company against the Shamrock Coal Company. Decree for plaintiff, and defendant appeals.

*Reversed, and bill dismissed.*

*E. L. Hogsett,* for appellant.

*Chaffin & Bland, and Fitzpatrick, Campbell, Brown & Davis,* for appellee.

MILLER, JUDGE:

It is sought by this appeal to reverse the decree below, requiring defendant to secure its mine at the places indicated by point "3", and if necessary by points "1" and "2", on the map filed as Exhibit "A" with its answer, so as to prevent the water which accumulates in its mine at those points from flowing into plaintiff's mine, but denying relief against such flowage at other points then open along the division line between the mines of the parties where they had respectively mined across said division line in accordance with an understanding

or attempted agreement between their general managers for an exchange of coal.

The defendant by its answer and proof relies on said agreement, not in writing, made about the first of the year 1918, which, according to its version thereof, provided that in consideration that plaintiff had prior thereto in violation of the statute, section 7 of chapter 79 of the Code, and for a considerable distance mined up to, and in several places over, the said division line into the coal of defendant, and was about to be sued by it for damages for the coal taken and for the penalties imposed by said statute, agreed, as a settlement and compromise of their respective rights and liabilities, that defendant might also mine and remove the coal on its side up to said division line opposite the places or points where plaintiff had removed the coal on its side of the line, and further that defendant was to go across this line onto plaintiff's land and mine out a certain area of coal designated on said map as area "B", and that plaintiff should continue on defendant's side of the line to mine out a certain area of coal designated as area "A", and that in addition thereto and in consideration of the premises defendant should also have the right to make break-throughs in its coal to the division line opposite where plaintiff had taken out the coal on said division line, for the purpose of drainage of the waters from its mine through a ditch in plaintiff's mine.

The record shows that at the time of the institution of this suit plaintiff had mined out practically all of area "A" on defendant's land, and that defendant was then engaged in mining and removing the coal from area "B" on plaintiff's land, and which at the hearing of the cause had been practically completed by it. There is no controversy about the fact that some agreement was made between the managers of the respective parties hereto, except that plaintiff and its representative contend that said agreement did not include any right of defendant to make such break-throughs to said line for the purpose of drainage, as alleged.

Plaintiff relies mainly on three propositions to support the decree: First, that plaintiff's manager McPhail, with whom said contract is alleged to have been made, was without authority to negotiate or consummate the contract in so far at least as it

related to removing the barrier coal, not alone because not authorized but because it would have been unlawful: Second, that being unlawful, the contract, if made, was not susceptible of ratification by the plaintiff: Third, that McPhail as manager had no authority *virtute officii* to burden the leasehold estate with such a servitude in favor of the defendant's adjoining mine, and that the burden of showing authority for or ratification of the alleged contract was upon defendant, not borne by it in this cause.

The reply of the defendant to these propositions is: First, that at the common law the owner of the higher mine has the right to work the whole mine and take out the produce without liability for injury to the lower mine from percolating waters: Second, that the right to mine coal in any part of the mine extends to the boundary line, except as restricted by the statute, section 7, chapter 79 of the Code: Third, that regardless of McPhail's want of authority as general manager to enter into said contract, plaintiff with full knowledge thereof had accepted and retained its benefits, and had thereby ratified it, and was estopped to deny his authority: Fourth, that equity is without jurisdiction to settle the title and boundaries to land where plaintiff has no equity against defendant holding the land: Fifth, that equity will not do a vain and useless thing, especially where actual injury will result to a party thereby: Sixth, that it does not appear from the record that plaintiff's remedy at law would be inadequate.

It is quite true, as was decided in *Carroll-Cross Coal Co.* v. *Abrams Creek Coal & Coke Co.*, 83 W. Va. 205, that the general manager of a coal company has no *implied* authority to dispose of or incumber to another company any part of its leasehold estate; and in that case we concluded that the evidence of ratification was not sufficient to overcome the evidence of want of such ratification of the alleged contract, justifying the reversal of the decree below thereon. Here, however, there is no denial of the contract or the ratification thereof so far as it pertained to the settlement of defendant's claim against plaintiff for damages and for the penalties for violation of the statute, except that part thereof relating to drainage. It is admitted that prior to the contract plaintiff had mined out the coal

up to the division line and had gone beyond that line and taken out a considerable portion of defendant's coal.

But did the contract include the right of drainage, as claimed? Agee, defendant's superintendent, with whom the contract was made, swears positively that it did. On the other hand, McPhail swears that it did not, but he admits what is proven by other witnesses, that it was agreed that as his company had mined and taken the coal for a considerable distance up to and beyond the division line, defendant would have the like right to take and remove the coal on its side up to that line and beyond, as alleged. Besides this evidence, Agee is corroborated by at least two other witnesses that later McPhail agreed that when his company had completed a ditch through its mine, then in course of construction, which he thought would be done in about ten days, defendant might turn the water then on its side of the line into that ditch. On this question plaintiff relies on the fact that the engineer who was requested to make a map showing the plan of the mines and where coal was to be taken out by each on the other's land did not remember that the agreement included the right of drainage. McPhail admits that the subject of drainage was discussed; his contention, however, is that no agreement was reached; that he advised Agee, manager for defendant, that he could not agree for his company on the drainage proposition without first submitting it to the corporate authorities for their decision. He, however, admits that the agreement did cover the right of defendant to mine and take the coal up to the division line opposite where his company had taken out the coal. This fact is a very strong circumstance tending to support the defendant's theory that the contract did include the right of drainage, for if the defendant was given the right to mine and take all of the coal up to the division line, no barrier coal would be left to protect the plaintiff's mine against drainage, its mine being on a lower level than that of defendant. So that the effect of the court's decree is simply to postpone the drainage of defendant's mine over plaintiff's property through points "1", "2" and "3" until defendant shall have exercised its right to take out all the coal up to the division line, for the break-throughs at the points complained of are all through defendant's coal, no coal at those points remaining on plaintiff's

side of the line to form any barrier against such drainage. Another piece of corroborative evidence is that much water from defendant's mine already flowed through the openings made by plaintiff into defendant's property in mining out area "A", assigned to it in said contract. We think the evidence of the agreement as alleged by defendant, including the right of drainage, largely preponderates in its favor; and if the decree below was predicated on plaintiff's theory that the contract in this particular had not been made out by sufficient proof, we think the court was in error and that it would have to be reversed.

We come now to the next proposition relied on by plaintiff; namely, that the contract, if made, was unlawful and not susceptible of ratification. The statute admits of such a contract, if made in writing between the parties in interest. Certainly, if they may make a contract in writing, they may be bound and estopped like parties to other contracts not in writing, after they had been executed. But it is said that the lessors were interested, and not being parties to the contract, and not having ratified it, are not concluded thereby. But we do not know from this record affirmatively that the lessors have not taken the benefits of the contract. Presumptively plaintiff acted lawfully towards its lessors. If the lessors knowingly received royalty on the coal mined, they most likely have been paid their royalties on the coal mined up to the division line and beyond on the defendant's land, as provided in the contract. If so, would they have the right to recover against defendant or against their own lessee the penalties imposed by statute? We hardly think so. But this question is not before us and is not decided. The questions we are permitted to decide are those involving the rights of the parties to this suit. Being concluded and estopped by the executed contract, and having been guilty of violating the law, how can plaintiff set up its own wrong or the alleged wrong of defendant in defense of the latter's rights under the contract? If the parties could make the contract giving to each the right to mine up to the division line, right of drainage followed as a resultant of the main contract. It seems to us that a complete answer to the plaintiff's claim to equitable relief is that old and well settled rule in equity, that when the

contract is illegal whether because *malum in se* or *malum prohibitum,* the law will not afford affirmative relief to either, but leave the parties as it found them.   *Rock* v. *Mathews,* 35 W. Va. 531, 535, and cases cited.

For the foregoing reasons we reverse the decree below and dismiss the bill, with costs to defendant incurred here and in the court below.

° *Reversed, and bill dismissed.*