# CHARLESTON.

THE RALEIGH COUNTY BANK *v.* BANK OF WYOMING.

(No. 5514)

Submitted October 27, 1925.   Decided November 3, 1925.

INJUNCTION—*Equity Will Not Afford Injunctive Relief to Either Party to Illegal Contract Enabling Bank to Make Excessive Loan to One Customer.*

A contract, either executory or executed, between two banks for the exchange of securities, made for the purpose of enabling one of them to carry a loan to its customer in violation of the banking law prohibiting a bank to loan to one person not more than 20% of its capital, surplus and undivided profits, is an illegal contract, and equity will not afford injunctive relief to either party on complaint of the other that the contract is being violated.

(Injunctions, 32 C. J. § 50.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Raleigh County.

Suit by the Raleigh County Bank against the Bank of Wyoming for an injunction. From a decree refusing to dissolve a temporary injunction, defendant appeals.·

*Decree reversed; injunction dissolved.*

*Dillon, Nuckolls & Mahan,* for appellant.
*McGinnis & McGinnis,* for appellee.

LIVELY, PRESIDENT:

This is an appeal by defendant Bank of Wyoming from a decree rendered against it refusing to dissolve a temporary injunction which prohibited it from prosecuting certain actions at law.

Appellant Bank of Wyoming instituted four suits at law on four protested notes against the makers and endorsers, the notices for judgment being returnable on May 25, 1925, in Raleigh County Circuit Court. The aggregate amount of these notes was about $25,000. Thereupon Raleigh County Bank filed its bill to restrain Bank of Wyoming from further proceeding with its suits at law, or in any way attempting to collect the notes.

By its bill plaintiff Bank, in effect, claims these notes sued on as its own, and says that to allow defendant Bank to sue on them at law and harass plaintiff Bank's customers would irreparably injure and damage plaintiff's banking. Plaintiff's claim to these notes is based on an agreement in writing formed by two letters simultaneously written on June 28, 1921, as the result of negotiations had between them that day. The letters are important and are as follows:

"The Raleigh County Bank,
Beckley, W. Va.

Gentlemen:
    It becomes convenient to us to have some one discount a note submitted to us for discount by one of our clients so we are sending this note to you, requesting you to accept this note and remit us pro-

100 W. Va.

ceeds. If for any reason you would prefer not to handle the note as straight out discount, and would prefer to have us accept a similar amount of notes from your bank we assure you that this basis would be entirely satisfactory. The note in question is executed by the Little War Creek Coal Company, J. C. Sullivan, Treasurer, dated 28th day of June, 1921, in the sum of $30,000.00 payable one hundred and twenty days after date to the order of J. C. Sullivan, and by him endorsed.

Concerning the responsibility of the maker and endorser of this note will say that they are absolutely responsible and reliable and we will see that you suffer no loss in connection with the note. This note, along with the other notes furnished us in exchange, should any others be furnished, is to be carried at the will and pleasure of both, and should either of the institutions *decided* to cancel these arrangements it is agreed that the same will be satisfactory to us to make an exchange of the paper then held by us whether they pay the note herein referred to and the notes furnished by you at this time or others hereafter substituted.

Trusting that this arrangement may be satisfactory to you and that we may have your immediate response, we are,

Very truly yours,
A. W. DAUBENSPECK, Cashier,
Bank of Wyoming, Mullens, W. Va.''

"June 28, 1921.

Bank of Wyoming,
Mullens, W. Va.

Gentlemen:

We are in receipt of your letter enclosing a note of the Little War Creek Coal Company in the sum of $30,000.00 dated as of this date payable to and endorsed by J. C. Sullivan, which you ask us to discount for you, agreeing that you will accept a similar amount of notes from us in the event that we accept the note herein referred to.

We have decided to do this and we enclose herewith the following notes:

Bair Brothers, Inc., payable to George Bair, Jr., and R. T. Bair, dated December 31, 1921, payable 180 days, $10,000.00.

L. Bee Phipps, payable to Dr. Robert Wriston, dated May 2, 1921, payable four months from date $7,000.00.

Joseph Chambers payable to The Raleigh County Bank, dated May 8, 1921, payable 120 days from date $12,932.00.

Of course you are not acquainted with the responsibility of the maker and endorser of these notes but for your information will say that they are entirely reliable and responsible and we will see that you suffer no loss in connection with these notes. Should any trouble arise we will furnish other notes to take place of these which security will be absolutely good.

As stated in your letter it is understood that either of us should we decide to withdraw this exchange of notes, that it will be satisfactory to the other but so long as your institution carries the notes given in exchange for the one furnished us then of course we are to carry the note for you, but should either decide to cancel this contract and lift the notes furnished in exchange to the other then of course the agreement can be cancelled.

Very truly yours,

G. C. HEDRICK, Cashier."

From the pleadings and affidavits, it appears that J. C. Sullivan, then president and owning or controlling a majority of the stock of defendant Bank and who was also treasurer, general manager and perhaps president of Little War Creek Coal Company, a corporation, together with A. W. Daubenspeck, cashier of defendant Bank, came to Beckley, the home of plaintiff Bank, for the purpose of procuring $30,000.00 for further financing the Coal Company. Defendant Bank could not loan the money to the Coal Company, because it would violate that provision of the State banking law which prohibits loans to any person, corporation or firm, of more than 20 per cent of capital stock, surplus and undivided profits. Chap. 54, Sec. 79-a (1), Code. This was communicated to plaintiff Bank. It was informed that the Coal Company was already a borrower in defendant's Bank, but there is a dispute as to whether plaintiff was informed

as to the true amount of the Coal Company's then indebtedness, which was, in fact, $23,000.00. That indebtedness to defendant Bank yet remains. Plaintiff Bank, by its cashier and president, declined to discount the $30,000.00 note of the Coal Company endorsed by Sullivan, giving as a reason therefor the lack of funds. The proposition for the exchange of securities embodied in the letters was then agreed upon. Each guaranteed that the other should not suffer loss because of the financial responsibility of the makers and endorsers; and both agreed that the contract should be cancelled when either party desired to do so and lift the notes exchanged. Plaintiff took the Coal Company note and delivered to defendant the notes listed in its letter. The Coal Company note was reduced to the sum of $27,248.91 at the time of the suit; the Phipps note held by defendant was reduced to $3,495.00; the Bair brothers note of $10,000.00 seems to have been paid, and two other notes for $5,000.00 each, of other parties, had been placed with defendant; and the Joseph Chambers note had been reduced to $12,432.00. The proceeds of the $30,000.00 note was credited to the Coal Company by defendant Bank. According to an affidavit in support of the bill, the Coal Company would pay the discounts on its renewals to defendant Bank; and the discounts on the notes held by defendant Bank were paid to plaintiff, and if any difference resulted in the sums so paid, the same would be remitted to the bank which was entitled thereto. The books of defendant Bank showed no record of the transaction. (To have done so would have shown a subterfuge to violate the banking law.) In the early part of 1925, Moran was selected as president of defendant Bank, Sullivan then owned about 38 per cent of the entire stock therein. Daubenspeck had severed his connection as cashier, and another person selected in his stead. The bill charges that later, plaintiff called upon defendant for an exchange of the securities sued on and proferred to return the $30,000.00 note (which had been reduced to $27,248.91); whereupon defendant refused, claiming the notes in its possession as its own. The said notes when due, were protested and suits entered thereon, as above set out.

Defendant demurred generally to the bill and on the ground that plaintiff had an adequate remedy at law. The demurrer being overruled, it answered, saying that the loan by plaintiff to the Coal Company was made solely for the benefit of the borrower and not for the benefit of defendant, that defendant had refused to discount that note, because of a then-existing loan to the Coal Company of $23,000.00, and to do so would violate the inhibition of the banking laws, a fact communicated to plaintiff at the time. Denial of the authority of President Sullivan and Cashier Daubenspeck to make the contract set out in the letters, is made. It avers that the discounts on the renewals of the Coal Company note were made by the Coal Company direct to plaintiff, and says that said note is the property of plaintiff; that the $23,000.00 note is yet unpaid, and it could not legally take the $30,000.00 note tendered by plaintiff, because of the banking law; and it disaffirms so much of the contract which makes it illegal. The affidavits on each side tend to support the bill and answer.

Is there error in the decree refusing to dissolve the temporary injunction inhibiting defendant from proceeding with the suits at law on the notes held by it?

The object of the negotiations leading up to and consummated in the contract embodied in the two letters, was to find a way by which the Coal Company could borrow $30,-000.00 for its use. Plaintiff in lending its aid to effecuation of the loan did not increase its own loans. No money was paid out. None was exchanged. Defendant, instead of paying for the securities delivered to it, credited the Coal Company's account with $30,000.00. It had the money, but could not make a direct loan to the Coal Company, because prohibited by the banking law. Its president (who was also an officer and representative of the Coal Company) accompanied by its cashier, asked plaintiff to discount the coal note. Plaintiff declined because of lack of funds. Defendant gave the reason why it could not discount and carry the note. Plaintiff's bill admits that such reason was given, in the following averment: "Then it was suggested to plaintiff by said officers of the defendant that the defendant could not under

the regulations and requirements of the State Banking Commissioner carry said note on its books for the reason that it would show an over-loan to its customer, Little War Creek Coal Company; that said defendant was at that time carrying loans for the said Little War Creek Coal Company to a considerable amount, and for that reason the said officers requested the plaintiff to handle said note in exchange for an equal amount of bills receivable then owned and handled by plaintiff''. The exchange was then made, as the bill says, solely for the accommodation of defendant, a temporary arrangement ''for the sole purpose of relieving defendant from any embarrassment on account of the said Little War Creek Coal Company note''. We are not unmindful of the claim in defendant's answer to the effect that the discount of the Coal Company note was made by plaintiff direct to the Coal Company; but we are viewing the contract, its inception and purpose, as contended for by plaintiffs as a basis of its right to the temporary injunction. Viewing the contract from plaintiff's standpoint, as pleaded and supported by its affidavits, it is difficult to arrive at any other conclusion than that plaintiff gave friendly assistance (without expenditure on its part) to aid the Coal Company in securing a loan, and to enable defendant to violate the banking law. A scheme was entered into between the parties by which defendant Bank could conceal a violation of law and escape its penalty. This scheme was executed. The exchange of securities was made. Whether the securities were mutually loaned with right to cancel the contract and have a return of them when either party so desired, does not change the purpose for which the scheme was to, and did, effectuate. Such being the case, can plaintiff be heard to complain of a breach of that scheme, in a court of equity? It is well settled that a court will not aid either party to enforce an illegal transaction, but will leave them where it finds them. The reason underlying the principle of law is that the public interest demands that such illegal transactions be discouraged and prevented. To leave the parties to an illegal contract, a contract which is bad either *malum in se* or *malum prohibitum,* may give an advantage to one of the litigants over the

other, but the courts are indifferent as to which suffers or gains. The doctrine was announced more than 100 years ago in *Swan* v. *Scott,* 11 Serg. & R. 155, where it was said: ''The test whether a demand connected with an illegal transaction is capable of being enforced at law is whether the plaintiff requires the aid of the illegal transaction to establish his case. If a plaintiff cannot open his case without showing that he has broken the law, a court will not assist him, whatever his claims in justice may be upon the defendant; and if the illegality be *malum prohibitum* only, the plaintiff may recover, unless *it be directly on the forbidden contract.''* The principle of law is so well settled that it would be useless to cite authorities. But see *Horn* v. *Star Foundary Co.,* 23 W. Va. 522; *Capehart* v. *Rankin,* 3 W. Va. 571, wherein the second point of the syllabus reads: ''Courts will not aid parties to illegal contracts which are executory only, to recover thereon. And where the contract is executed a court will not aid a *particeps criminis* in setting it aside''. *Coal Co.* v. *Coal Co.,* 86 W. Va. 675; *Rock* v. *Mathews,* 35 W. Va. 531, citing Pomeroy Eq. Jurisprudence, Vol. I, Sec. 402.

To illustrate the application of the principle here applied, suppose defendant Bank was proceeding in equity to cancel the contract or for its specific performance, and was seeking to prohibit suit by plaintiff Bank on the Coal Company note against the maker? Whenever it appeared in such proceeding that complainant had entered into the contract for the purpose of avoiding a positive law and consequent penalty, the court would promptly proclaim that its hands were not clean, and would deny relief. As between the parties, the equities may be in favor of plaintiff; but on this phase of the case we can express no opinion, for the cause has not been fully developed. But the courts are not concerned as to the equities of the parties to a contract the object of which is to circumvent and defeat the operation of a public statute passed for the welfare of the people. The cause, as now developed, does not justify the injunctive relief awarded, and the order refusing to dissolve the injunction will be reversed and the injunction dissolved.

*Decree reversed; injunction dissolved.*