DANIEL G. HOGLUND

*v.*

MERVIN C. CURTIS, *et al.*

(No. 10241)

Submitted September 13, 1950. Decided October 17, 1950.

736

Given, Judge, dissenting.

*H. D. Rollins,* for appellant.

*Woodroe & Kizer, John O. Kizer,* for appellees.

Riley, Judge:

Daniel G. Hoglund, hereinafter referred to as "plaintiff", filed in the Circuit Court of Kanawha County, his original and amended and supplemental bills of complaint, against Mervin C. Curtis and Lenore M. Curtis, his wife (hereinafter variously referred to as "defendants" and as the "Curtises"), H. L. Snyder and James A. Mc-Whorter, Trustees under a deed of trust, executed by the Curtises securing a Federal Housing Administration loan (hereinafter referred to as "F. H. A. loan") on the property in litigation, and Connecticut General Life Insurance Company, the beneficiary under said deed of trust, praying: (1) That the Curtises account to plaintiff for the rent which plaintiff alleges they agreed to pay to him for the use of the property in litigation from the late summer or autumn of 1941, until the time this suit was brought; (2) that the Curtises disclose the amount paid by them on the F. H. A. loan and the amount now due; (3) that the Curtises be required to reconvey the property to plaintiff; (4) that the Curtises be required to pay to plaintiff

such sums and rent for said period of time as exceeds the amount they paid on the F. H. A. loan, less two hundred and fifty dollars, which the Curtises paid to plaintiff's father, John W. Hoglund, during plaintiff's absence in the armed services; (5) that the defendant trustees, Snyder and McWhorter, be enjoined from enforcing the deed of trust until plaintiff's rights can be determined in this suit; and (6) that the defendant, Connecticut General Life Insurance Company, be required to disclose the amount now owed to it on the F. H. A. loan.

The Curtises in their answer and amended answer deny that they promised to reconvey the property to plaintiff, and in their amended answer they pleaded that the alleged promise to reconvey, if made, was barred under the statute of frauds, Code, 36-1-3.

The circuit court filed a memorandum as a part of the record, expressing the opinion that the plaintiff is not entitled to the relief prayed for in his original and amended and supplemental bills of complaint for the reason that the plaintiff, and the defendant, Mervin C. Curtis, were equally guilty of executing a scheme whereby defendant Curtis was enabled to secure an F. H. A. loan on the property in litigation "in violation of the Federal statutes relative thereto."

The plaintiff prosecutes this appeal from a decree denying him the relief prayed for and dismissing his bills of complaint at his costs.

Three main issues are involved: (1) Whether the Curtises hold the legal title to the property in litigation as trustees for plaintiff with the duty to reconvey to him; (2) whether plaintiff is guilty of laches; and (3) whether plaintiff, as the circuit court found, is barred from relief because, in aiding the Curtises to secure an F. H. A. loan on the property in question, he participated in the violation of the Federal statute governing applications for F. H. A. loans.

The pertinent provision of the statute Section 1731 (a), Title 12, Banks and Banking, U. S. C. A. reads:

"Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Federal Housing Administration for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by the said Administration, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of the said Administration under this chapter, (makes, passes, utters, or publishes, or causes to be made, passed, uttered, or published any statement, knowing the same to be false, or alters, forges, or counterfeits, or causes or procures to be altered, forged, or counterfeited, any instrument, paper, or document, or utters, publishes, or passes as true, or causes to be uttered, published, or passed as true, any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited) or willfully overvalues any security, asset, or income, shall be punished by a fine of not more than $3,000 or by imprisonment for not more than two years, or both."

On March 20, 1941, for the purpose of building a house thereon, plaintiff purchased and obtained from The Charleston National Bank a deed for Lot No. 29 and the eastern one-half of Lot No. 28, Block D of the Savage Addition to the Town of Belle, West Virginia, for five hundred and forty dollars, one hundred eight dollars thereof being in cash and the remainder of the purchase price, in the amount of four hundred and thirty-two dollars, being represented by a promissory note in that amount, payable in installments of ten dollars each, payable monthly beginning on April 10, 1941, and secured by a deed of trust on the property.

Shortly after the purchase of this property plaintiff began the erection of a five-room shingle house, with basement thereunder, estimated to cost approximately fifty-two hundred dollars. For this purpose he applied to the cost of construction some money which he had

and the sum of six hundred fifty dollars, which he borrowed from The Charleston National Bank on a note endorsed by his mother, Margaret Hoglund. With the money thus obtained and the work which he and his father planned to do on the construction during evenings and on Saturdays, he planned to finance the building costs through an F. H. A. loan in the amount of four thousand dollars. Accordingly, he applied for such loan, and procured a commitment in that amount. In the meantime he had proceeded with the construction of his house. While he purchased the materials and contracted a part of the work out, he and his father, who was a carpenter foreman, worked on the house in the evenings and on Saturdays. On August 20, 1941, the house being practically completed, he rented it to defendant, Mervin C. Curtis, by a written lease for a rental of thirty-seven dollars a month. Curtis and his wife, Lenore Curtis, were to take possession during the early part of September of that year. They moved into the house about September 15, 1941, and shortly thereafter plaintiff was notified by his draft board that he would be inducted into the United States Army to serve for a period of one year. The F. H. A., learning of this, promptly notified plaintiff that the commitment on the F. H. A. loan was revoked and that the loan would not be granted. At that time the house was practically completed, and the persons who had furnished materials and labor were demanding payment of their claims and threatening to assert mechanics' liens. Faced with this pressing situation, plaintiff then undertook to sell his house for fifty-five hundred dollars, in order to pay off all bills which had been incurred in the construction thereof and to protect his investment.

The plaintiff, being unable to find a purchaser for the house at the price he was asking, entered into an agreement with the defendant, Mervin C. Curtis, whereby plaintiff agreed to convey the house to Curtis, who would then apply for and obtain an F. H. A. loan in his own name and that the proceeds be used to pay off the balance owed on the lands and the unpaid bills incurred in the

erection of the house. According to plaintiff's evidence, the Curtises would continue to live in the house at least during plaintiff's absence, with the agreement that plaintiff would pay a rental of thirty-seven dollars a month to meet the monthly payments of approximately thirty-one dollars on the F. H. A. loan, and remit the difference of six dollars monthly to plaintiff's father and mother. The plaintiff testified and introduced the testimony of his father and mother to the effect that the arrangement was that before plaintiff's return from his one-year army service, the Curtises would agree to reconvey the property to plaintiff. This the Curtises deny. It is, however, plaintiff's position that the arrangement was entered into in order that the Curtises might have a place to live for at least one year while plaintiff was in the service, and that plaintiff would be enabled to keep his property, such being predicated on the alleged promise of the Curtises to reconvey.

Shortly after the deed conveying the property from plaintiff to defendant, Mervin C. Curtis, was executed, the latter advised the plaintiff that it was necessary for him to increase his bank balance to the extent of one hundred twenty-seven dollars, in order to have sufficient balance to cover the cost of obtaining the F. H. A. loan. Thereupon, plaintiff withdrew a part of his savings from The Kanawha Valley Bank of Charleston, and paid one hundred twenty-seven dollars thereof to Curtis on the basis, as Curtis claims, that plaintiff would pay all costs and expenses incurred in procuring the loan. On October 24, 1941, plaintiff executed and thereafter delivered to Curtis a deed purporting to convey to him the fee simple title to the house and land. Steps were then taken by the Curtises to obtain the proposed F. H. A. loan in the amount of four thousand dollars. With the proceeds of this loan, which was finally consummated by the receipt by the Curtises of the money in December, 1941, the Curtises paid off all claims against the property, including a balance of $378.76 on the purchase price of the land due The Charleston National Bank. Before the loan

was fully approved and the money paid, however, it became necessary for plaintiff's father to furnish some material and do some additional work on the house, for which, so far as this record discloses, he was not compensated.

Plaintiff having reported for military service on October 27, 1941, the attack on Pearl Harbor on December 7, 1941, prompted the United States to enter into World War No. II, and plaintiff's status was then changed from an inductee for the period of one year to a member of the military forces of the United States for the duration of the war. For several months thereafter the defendants met the payments on the F. H. A. loan as they fell due, and remitted the difference between thirty-seven dollars monthly rental and the monthly payment on the F. H. A. loan to plaintiff's father and mother, but in March, 1942, they gave a cashier's check for two hundred fifty dollars to plaintiff's father and mother, and advised them that they would pay a like amount later, but would thereafter pay no more. This check was accepted, but the proceeds were never paid to plaintiff, and upon plaintiff's next trip home from the army in June, 1942, the testimony indicates that he was displeased with what had taken place. The Curtises continued to occupy the property, and to make payments on the F. H. A. loan, but after payment of the two hundred fifty dollars nothing more was paid to plaintiff or to his father and mother by way of the difference between the purported monthly rent of thirty-seven dollars and the monthly payment on the F. H. A. loan, nor were the other two hundred fifty dollars, which plaintiff claims the defendants promised to pay in addition to the sum of two hundred fifty dollars paid to plaintiff's parents in March, 1942, ever paid.

Plaintiff was not discharged from the United States Army until October, 1945, when he returned to the home of his parents at Belle. He testified, without contradiction, that he consulted his father about the conveyance of the house, and was persuaded by the latter that he (plaintiff) could do nothing; and that accordingly he let the

matter rest until May, 1948, at which time plaintiff's then wife, Willis Hoglund, consulted an attorney, shortly after which this suit was brought. The plaintiff, after his return from the army, saw Curtis but did not speak to him about the transactions with reference to the house. His failure to do so immediately before suit seems to be predicated upon the fact that plaintiff somehow got the impression that the Curtises were going to sell the house without delay, and therefore it was thought advisable to enter proceedings immediately before the Curtises could convey the property away.

From this record it appears that a *lis pendens* was filed. Before the deed from plaintiff to Curtis was executed and before the F. H. A. loan was consummated, the plaintiff and Mervin C. Curtis entered into a written agreement, dated September 26, 1941, introduced in evidence, whereby the plaintiff purported to sell unto the defendant, Mervin C. Curtis, the property described as a "one-story white shingle house located on Second Street, Block D, in Lower Belle, W. Va., for the sum of $4700.00." The agreement recited that Hoglund had received from Curtis the sum of seven hundred dollars as a down payment on the property described.

Plaintiff testified that he signed this contract on September 26, 1941; that he received no money at the time he signed or afterwards; that the contract was prepared and presented to him in Curtis' office in Belle; and that Curtis told him this contract was necessary in order to procure the F. H. A. loan; but the evidence conflicts materially on the question as to who fathered the alleged scheme of having the contract recite that the sum of seven hundred dollars had been paid on the property, in order to comply with the loan requirements of the F. H. A. Be that as it may, Fred C. Wells, who testified for both the plaintiff and defendants, stated that he was employed by The Charleston National Mortgage Company as manager; and that his duties with reference to the making of loans, commonly known as F. H. A. loans in September, 1941, embraced the approval of applications

and the supervision of the preparation of all data necessary for the processing of such loans. This witness testified that the F. H. A. loan was granted on the property in question, as evidenced by a deed of trust signed by the Curtises to the defendant trustees on October 28, 1941, and that thereafter the loan was made. This witness, however, testified that this loan was made on the basis of the title being in defendants; that though a commitment had been made for the loan on the basis of the contract between plaintiff and defendant, the F. H. A. depended entirely upon the actual state of applicant's title. The witness testified further that the loan was not made before Mervin C. Curtis got his title to the property under the deed from plaintiff, nor was it made before the Curtises executed a deed of trust to the defendant trustees; and that it is the custom of the agencies of the F. H. A. not to make loans before the applicant gets title in his own name. From Wells' testimony on cross examination it appears that the contract of sale containing the misrepresentation as to the payment of seven hundred dollars between Hoglund and Curtis was filed with the Curtises' application. This witness testified that it was absolutely necessary to the filing of the application, and that the loan would not have been granted upon the application of Curtis without the filing of the contract and the statement contained therein as to the amount of the purchase price purported to have been paid by the applicants.

The testimony in plaintiff's behalf shows that while the contract of sale of September 26, 1941, was executed with the understanding that the Curtises would reconvey when plaintiff returned after his final discharge from the army, the deed from plaintiff to the Curtises was on its face an absolute conveyance. Plaintiff, however, testified that the contract filed with the application was "only a pretended contract"; that the recital contained therein as to payment of seven hundred dollars of the purchase price was false; that he knew it was a condition to Curtis' obtaining the loan that it appear to the F. H. A. that the Curtises had made a down payment of seven hundred

dollars. The plaintiff expressly testified that the false statement contained in the contract of September 26, 1941, between defendant, Mervin C. Curtis, and himself was made "to save the house for me"; and further "that it had to be done in order to make the F. H. A. loan. I had to appear to sell the house to Mr. Curtis so he could secure the loan." Plaintiff testified that at the time he signed the contract of sale he knew that the statement contained therein to the effect that the Curtises had paid seven hundred dollars on the purchase price was not true; but that the statement was inserted in the contract simply for the purpose of aiding them to obtain the loan.

Under this state of facts, the initial and basic question before us is whether the Curtises hold the legal title to the property in litigation as trustees for plaintiff with the duty on their part to reconvey it to him. If plaintiff is to prevail on this question, he must bring this case outside the provisions of Code, 36-1-3 (the statute of frauds), which provides that "No contract for the sale of land, or the lease thereof for more than one year, shall be enforceable unless the contract or some note or memorandum thereof be in writing and signed by the party to be charged thereby, or by his agent * * *." But because the alleged promise to reconvey is parol, plaintiff must establish by a preponderance of the evidence that the conveyance of the property in litigation, though absolute on its face, was made to the Curtises in trust, with the duty on their part to reconvey to plaintiff. Code, 36-1-4, provides: "* * * If a conveyance of land, not fraudulent, is made to one in trust either for the grantor or a third person, such trust may be enforced, though it be not disclosed on the face of the conveyance, nor evidenced by a writing * * *." As indicated by the Revisers' Note, this section is new. The Revisers have stated in a note the reasons which prompted the enactment of this section of the Code in the following language: "Our State has not had any express statutory requirement for the creation of trusts in lands. The question has given rise to much litigation, and the position of our Supreme Court of Appeals seems to be that, in the case of a conveyance of land upon a *

parol trust, if the trust is for a third person, it is enforceable, but if it is for the grantor, it is unforceable. * * * This revision * * * makes a parol trust in favor of a grantor in a conveyance enforceable." Two cases decided by this Court since the enactment of the new statute bear materially upon the issue immediately under consideration. In *Winfree v. Dearth,* 118 W. Va. 71, 75, 188 S. E. 800, in which the Court upheld an alleged trust in favor of the grantor, the Court said: "May a grantor be permitted to establish a trust in his favor where he has conveyed the property for a recited valuable consideration? An affirmative answer is implicit in the statute itself (supra). The provision therein, in effect, that a grantor may by parol evidence establish an express trust for his own benefit, necessarily carries the implication that the deed he made to the grantee was a valid deed transferring the legal title. The said statute must be deemed applicable to any valid deed, including a deed based on valuable consideration. There is nothing in the statute to indicate otherwise. It does not by any words of limitation restrict its application to deeds made without consideration under Code, 36-3-6." In the more recent case of *Boggs* v. *Boggs,* 125 W. Va. 600, 608, 25 S. E. 2d 631, the rule adopted in the *Winfree* case was relied on in our holding that under Code, 36-1-4, a conveyance of land, not fraudulent, made in trust for a grantor may be enforced by parol evidence alone; but in that case, the Court laying down the rule that "words of an instrument of unconditional conveyance of land should be vitiated through the medium of establishing a trust only upon competent evidence which is so clear as to leave no doubt that the trust was, in fact, created", denied relief to plaintiffs to establish such a trust by parol evidence on the ground that their proof did not sustain the allegations of their bill of complaint. Having in mind the legislative fiat, contained in the statute, and the postulates, set forth in the *Winfree* and *Boggs* cases, let us at this time review the evidence bearing on the question whether plaintiff, Hoglund, has established by parol evidence, which is the only kind of evidence in this record bearing on the question, that the conveyance

from plaintiff to the Curtises was made in a trust, which imposed upon the latter the duty to reconvey. On this plaintiff's and defendants' testimony is in such conflict that of itself plaintiff's testimony to the effect that defendants promised to reconvey and the defendants' testimony in denial thereof, would not be the basis for this Court to say that the plaintiff has established a trust within the meaning of Code, 36-1-4. Other evidence, however, is contained in this record besides plaintiff's categorical affirmative statement that there was such a promise and the defendants' denial thereof. In the first place, it may be inquired why, if prior to the conveyance and in furtherance of obtaining a loan from the F. H. A., did plaintiff pay one hundred twenty-seven dollars to enhance Mervin C. Curtis' bank account so that he could pay the cost of the loan, and why did Curtis testify that this payment was made to him on the basis that plaintiff was to pay the cost of the loan, if the parties at that time deemed that after the conveyance the plaintiff would have no further interest in the property? In addition, the Curtises, by the payment of rent, have taken a decidedly inconsistent position from that taken by them in their parol denial of the promise to reconvey. By their undertaking to pay rent to plaintiff's parents during plaintiff's absence in the army, plaintiff and defendants established a relationship which is almost tantamount to that of landlord and tenant, which relationship implies ownership of the property leased in the landlord. If the conveyance from Hoglund to the Curtises, absolute and unconditional as it was on its face, served to vest in the Curtises the absolute title to the property in litigation without any duty on the part of the Curtises to reconvey, or any other equity in plaintiff's favor, the necessity or even the reason for the payment of rent would not be present. The payment by the Curtises of the two hundred fifty dollars to plaintiff's parents during plaintiff's absence, Curtis' statement at the time of payment that he would within one year pay two hundred fifty dollars more and thereafter would make no further payments, did not, in our opinion, operate to destroy the understanding and the re-

lationship resulting therefrom, which had been reached by the parties prior to plaintiff's entry into the army. If plaintiff's parents, or either of them, were plaintiff's agent to collect from Curtis the difference between the monthly rent of thirty-seven dollars agreed upon and the monthly payments of thirty-one dollars each to the F. H. A., they were his agent only for the purpose of making such collection. A careful perusal of this record does not disclose that they were in any sense of the word plaintiff's agent to alter the agreement theretofore entered into between plaintiff and defendants as to the occupancy of the house by the Curtises during plaintiff's absence, the payment to plaintiff's parents of the balance of the rent after the F. H. A. payments and the alleged duty to reconvey. To use a rather trite expression, this is a case where the Curtises' actions speak louder than their words, and serve to overcome the evidentiary effect of their denials of the promise to reconvey. So, in our opinion, plaintiff's position is sustained, to use the language in the *Boggs* case, by "competent evidence which is so clear as to leave no doubt that a trust was, in fact, created."

But the defendants, the Curtises, say that even if plaintiff has succeeded in establishing a trust under the provisions of Code, 36-1-4, the plaintiff was guilty of laches in bringing this suit, and he is thereby barred. The only element in this record which may tend to establish laches on plaintiff's part is that, though he was released from military service in the latter part of 1945, he did not bring this suit until the issuance of process on May 24, 1948. During plaintiff's extended service in the army, he was under a disability to bring suit in order to protect whatever interest he may have had, and his delay in bringing the suit of approximately two and a half years after his return is fully and satisfactorily explained by him. Upon his return, having sought advice from his father, he was told that he could do nothing about the matter since "Curtis had all the papers". Relying upon this advice, he delayed bringing suit until he and his wife heard that the Curtises were about to sell the property for eight thousand dollars, and then plaintiff's wife, Willis Hoglund,

for the first time consulted an attorney, whereupon plaintiff, not deeming it advisable to delay further, caused this suit to be brought and a *lis pendens* filed.

In this jurisdiction mere delay, especially if it is explained, is not laches barring relief. "Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." *Bank of Marlinton* v. *McLaughlin*, 123 W. Va. 608, pt. 2 syl., 17 S. E. 2d 213. Here Hoglund's delay in asserting his rights by the bringing of a suit is fully explained in this record, and the Curtises having continuously lived in the house, part of the time without the payment of rent, were not put to any disadvantage by the delay. See also *Bank of Marlinton* v. *McLaughlin*, 121 W. Va. 41, pt. 1 syl., 1 S. E. 2d 251; and *Carter* v. *Carter*, 107 W. Va. 394, pt. 3 syl., 148 S. E. 378, in which this Court held: "Delay alone does not constitute laches; it is delay which places another at a disadvantage." While it may be conceded that during the delay in the institution of this suit, due to a change in economic conditions, the property increased in value, such increase in value did not, by reason of defendants' own wrong, inure to their benefit. We therefore perceive no merit in plaintiff's position on this point.

Finally, it becomes necessary for us to discuss plaintiff's last ground of error, being the one upon which the circuit court expressly denied plaintiff relief, that is, that plaintiff is not entitled to the relief prayed for because he and the defendant, Mervin C. Curtis, were equally guilty of executing a scheme whereby defendant Curtis was enabled to secure an F. H. A. loan on the property in litigation "in violation of Federal statutes relative thereto."

It is asserted by defendants that plaintiff having entered into a contract of sale which contained the false statement that Curtis had paid plaintiff seven hundred dollars, which statement was inserted in the contract for the purpose of obtaining the loan, the alleged promise to reconvey is fraudulent and the whole transaction is vitiated thereby, including the promise to reconvey. Re-

liance is had on Section 1731 (a), Title 12, Banks and Banking, U.S.C.A., hereinabove quoted. With this position we do not agree, though it must be said that the circuit court had ample reason from this record to find that plaintiff entered into the contract for the purpose of assisting Curtis to get an F. H. A. loan, to which he was not entitled, in fact, he so testified. He said it was a "pretended contract"; and that he signed it for the purpose of saving his property. That being so, the question arises: is the fraud and misrepresentation on plaintiff's part and his participation in the scheme to assist the Curtises fraudulently to obtain the loan, the kind of fraud which would bar him in a court of equity from establishing a parol trust in his favor under Code, 36-1-4? Undoubtedly, the F. H. A. relied upon the contract and the misrepresentation contained therein, as shown by Fred C. Wells' testimony on cross examination, who assisted in obtaining the loan for the Curtises. Wells testified to the effect that had it not been for the contract, which was evidently exhibited with the Curtises' application, the loan would not have been made. But the deed from Hoglund to the Curtises was not fraudulent. Clearly, the plaintiff, the owner of the property, had the right to convey his property to them, and he conveyed it upon the promise on the part of the grantees to reconvey. The conveyance and the promise to reconvey certainly did not serve to defraud the Federal Housing Administration. It was not necessary for plaintiff to prove the fraud in the loan transaction in order to establish the alleged promise to reconvey. A reading of Code, 36-1-4, serves to show that the fraud contemplated by the Legislature in the enactment of the statute must be in the conveyance itself on the basis of which a trust is sought to be established. In the case of *Raleigh County Bank* v. *Bank of Wyoming*, 100 W. Va. 342, 130 S. E. 476, this Court quoted with approval the language of an early Pennsylvania Court in the case of *Swan* v. *Scott*, 11 Serg. & R. 155, as follows: " 'The test whether a demand connected with an illegal transaction is capable of being enforced at law is whether the plaintiff requires the aid of the illegal transaction to establish

his case. If a plaintiff cannot open his case withing showing that he has broken the law, a court will not assist him, whatever his claims in justice may be upon the defendant; and if the illegality be *malum prohibitum* only, the plaintiff may recover, unless *it be directly on the forbidden contract.*'" In the *Raleigh County Bank* case this Court dissolved an injunction which the trial court had awarded to plaintiff bank on its complaint that an illegal contract participated in by both parties was being violated. In that case the two banks entered into a contract for the exchange of securities made for the purpose of enabling one of them to carry a loan to its customer in violation of the banking law prohibiting a bank to lend to one person more than twenty per cent of its capital, surplus, and undivided profits. There the contract, in which both parties participated, was the contract sought to be enforced in a court of equity. Here whatever illegality or fraud exists, is in the loan application filed with the F. H. A., which this record discloses resulted in no injury to anyone. Here, as above indicated, the transaction under appraisement, namely, the conveyance and promise to reconvey, was neither invalid nor fraudulent. The statute, Code, 36-1-4, specifically inveighs against fraud in the conveyance which is sought to be made a trust in favor of grantor or a third person. We therefore are of opinion that whatever fraud there was, it did not enter into the promise sought to be enforced. The case of *Dye* v. *Dye,* 128 W. Va. 754, 772, 39 S. E. 2d 98, succinctly and in pertinent language sustains this position: "A party guilty of fraud *in a transaction on which he relies for recovery* can have no relief in equity against another person, even though that person may be equally guilty." (Italics supplied).

For the foregoing reasons the judgment of the Circuit Court of Kanawha County is reversed and the cause is remanded to that court for the entry of a decree in plaintiff's favor, which decree, in order to do equities between the parties, should provide for the assumption by plaintiff of any remainder due on the F. H. A. loan, the reimbursement by plaintiff of the Curtises for any money paid by

them on account of the loan, also the sum of two hundred fifty dollars paid by defendants to plaintiff's parents, and the decree also should provide that the Curtises pay the plaintiff any balance due for the difference between the monthly rent of thirty-seven dollars and the monthly payments made by them on the F. H. A. loan of thirty-one dollars during defendants' occupancy of the house.

*Reversed and remanded with directions.*

·GIVEN, JUDGE, dissenting:

The trial court found that "the plaintiff and defendant, Mervin Curtis, were equally guilty of conceiving and executing a scheme or plan whereby the defendant Mervin ·Curtis was successful in securing a F. H. A. loan in violation of the Federal statutes relative thereto." I deem the evidence conclusive as to this finding, and do not understand that the majority opinion questions its correctness. In addition to the illegality of this scheme, its fraudulent character is clearly established. Plaintiff admits that the "pretended contract" was made for the purpose of deceiving the loan company into making a loan that would not have been otherwise made, and the loan was actually made, on false representations, to the effect that Curtis was the true owner of the property, and that he had a clear equity in the property over and above the amount of the loan, and that he actually paid $700.00 for that equity. Thus because of the false and fraudulent representations the loan company was induced to make a loan to Curtis, who had no equity whatsoever in the property, and which loan certainly would not have been made except for the false and fraudulent representations made by both the plaintiff and defendant.

I think it no answer to say that the conveyance itself was not tainted with fraud. The whole scheme must be considered. The "pretended" contract was part of the illegal and fraudulent scheme and the plaintiff could not recover herein except by proving the same was "pretended", together with the oral agreement to recon-vey. The false representations made by both parties to

the effect that Curtis was the owner of an equity of $700.00 and had actually paid $700.00 therefor was another step in the scheme. The execution and delivery of the deed sought to be set aside were only further steps in the fraudulent scheme, made for the purpose of placing Curtis in position where he could falsely represent that he was the absolute owner of the property, thus inducing the loan company to make a loan that it would not otherwise have made. It seems clear, therefore, that the whole scheme was permeated with fraud as well as with illegality. I do not believe the fraud or illegality to be trivial or insignificant. The plaintiff obtained that for which the scheme was devised, the F. H. A. loan. The loan having been obtained, the plaintiff was content to remain silent until the property had practically doubled in value due to economic conditions, and until the statute of limitations had barred prosecution of the criminal violation committed by him, a violation of such serious nature that he could have been subjected to long imprisonment and to a fine equal to the then probable value of the property.

The majority opinion seems to place reliance upon the provisions of Code, 36-1-4. Those provisions deal only with the right to prove the existence of a trust and do not attempt to say what does or what does not constitute fraud. I presume that the majority would not go so far as to say that the statute has abolished the "clean hands" maxim. Neither is it any answer to say that no one has suffered loss because of the illegal and fraudulent transaction or scheme, if such a conclusion be justified by the record. I find no authority to justify the position that the "clean hands" maxim will be applied by a court of equity only in situations where loss has resulted from the fraud or illegality.

In 30 C. J. S., Equity, Section 93, it is stated that "The clean hands maxim bars relief to those guilty of improper conduct in the matter as to which they seek relief. It is invoked to protect the integrity of the court." I cannot bring myself to the view that such fraud and illegality, including the violation of a criminal statute, constituting

a felony, is not "improper conduct". In 19 Am. Jur.,. Equity, Section 471, it is stated that "relief will be denied where it appears that the right upon which the complainant relies has grown out of *a wrong, a breach of duty,*. or a *violation of law.*" (Italics supplied.) This Court held in *Jones* v. *Evans,* 123 W. Va. 394, 15 S. E. 2d 166,, Point 1, Syllabus, that:

> "Equity will not, at the suit of a wrongdoer, lend its aid in extricating him from a position where his own fraudulent or illegal conduct has placed him."

I think that the case of *The Raleigh County Bank* v.. *Bank of Wyoming,* 100 W. Va. 342, 130 S. E. 476, cited in the majority opinion, is controlling in the instant case. In the *Bank of Wyoming* case the parties had agreed to exchange certain securities and carry certain loans in order that one of them would be in position to grant a loan to one of its customers in violation of the statute making it illegal for a bank to loan one person more than twenty per cent of its capital, surplus and undivided profits, a violation certainly not more serious than the criminal violation in the instant case. The Court held:

> "A contract, either executory or executed, between two banks for the exchange of securities, made for the purpose of enabling one of them to carry a loan to its customer in violation of the banking law prohibiting a bank to loan to one person not more than 20% of its capital, surplus and undivided profits, is an illegal contract, and equity will not afford injunctive relief to either party on complaint of the other that the contract is being violated."

In *Kokernot* v. *Gilstrop,* 143 Tex. 595, 187 S. W. 2d 368,. the false statement made to the Federal Housing Administration for the purpose of obtaining a loan was to the effect that there existed no second lien indebtedness against the property offered as security for the loan. The Court, in deciding the case, stated:

> "It follows that, insofar as recovery of title or the enforcement of any lien against the property

are concerned, the transaction evidenced by the contract and the deed under which respondents claim title falls within that class of contracts which are held to be illegal and void and upon which a plaintiff cannot recover when it is necessary for him to prove his own illegal acts as a part of his cause of action. The law leaves the parties to such contracts where it finds them."

See also *Hartwell* v. *United States*, 107 Fed. 2d 359; *Barnsdall* v. *Owen*, 200 Fed. 519; *Haymond* v. *Hyer*, 80 W. Va. 594, 92 S. E. 854; *Wheeling Dollar Savings and Trust Company* v. *Hoffman*, 127 W. Va. 777, 35 S. E. 2d 84.

Being of the opinion that the circuit court was right in its finding, and in applying the "clean hands" maxim and refusing relief to the parties, and should be affirmed, I respectfully dissent.